# CAMP *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

Argued January 27, 28, 1885.—Decided March 2, 1885.

When a regulation, made by the head of an executive department in pursuance of law, empowers subordinates, of a class named, to contract on behalf of the United States as to a given subject matter; and further directs that "any contract made in pursuance of this regulation must be in writing," a verbal executory contract relating thereto is not binding upon the United States.

When an executive regulation directs officers of one class to make a contract on behalf of the United States, it confers no authority to make it upon officers of a different class, although employed about the same government business.

Independently of the question of authority, the record does not show that the contract set up in the plaintiff's petition was entered into.

The appellant brought this action on the 13th day of April, 1869, to recover a balance alleged to be due as compensation for collecting and delivering to the United States, in 1864, a large amount of cotton, in bales, which was captured and abandoned property within the meaning of the acts of Congress. He claimed to have performed the services in question under an arrangement or agreement with an agent of the Treasury Department, which the Secretary of the Treasury subsequently recognized as a valid contract with the government. He admitted certain payments on his claim, and asked judgment for the further sum of $80,000. The court below dismissed his petition.

The material facts, as found by the Court of Claims, were, in substance, as follows:

In the early part of 1864, one Hart, an assistant special agent of the Treasury Department for the district of Natchez, in the State of Mississippi, made a verbal arrangement with Camp, whereby it was understood and agreed between them that the latter should bring out and turn over to the United States, through their agent in Natchez, about twenty-two hundred bales of cotton, stored on the banks of Buffalo Bayou, in Adams County, Mississippi, within that district, and the property of one John K. Elgee, a resident of Alexandria, Louisiana, then within the lines of rebel occupation. "The agent," the findings of fact stated, "was then to represent the arrangement and business, whatever it might be, to the Secretary of the Treasury, and was likewise to represent that he had assured the claimant, by the arrangement, that the Secretary would allow to him twenty-five per cent. of the proceeds of the cotton at least. No bond of indemnity was given by the claimant: By the arrangement the claimant was also to pay to the agent, Hart, out of the proceeds when received by him, from

$5,000 to $10,000, provided the Secretary of the Treasury should see no impropriety in his, the agent's, accepting from the claimant a portion of the proceeds."

On or about March 31, 1864, Camp, representing himself as a treasury agent, engaged the services of a transport, which, under the protection of a gunboat, ascended Buffalo Bayou, took on board 572 bales of the Elgee cotton, and brought it to Natchez, where it was seized by General Tuttle, commanding the Federal military forces, on suspicion that the claimant intended to appropriate it to himself, and placed under guard in the government yard. Shortly thereafter Camp informed the supervising special agent and the assistant special agent of the treasury of what he had done.

By direction of the supervising special agent the cotton was forwarded to St. Louis, consigned to O. S. Lovell, an agent of the Treasury Department. After it reached that city, Elgee brought an action of replevin against Lovell in the Circuit Court of St. Louis County. The United States took charge of the defence, and on June 22, 1864, a stipulation was entered into between the Treasury Department and Elgee, whereby that action was removed to the Circuit Court of the United States, and the cotton was sold, the proceeds, after paying certain charges, being invested in bonds, which were held to abide the result of the litigation. In that suit a judgment was obtained by the government, which was affirmed by this court.

The appellant presented his claim for compensation to the Treasury Department, which, by its assistant secretary, on the 6th of December, 1865, directed the Commissioner of Customs to "state an account and make a requisition in favor of Benjamin F. Camp upon F. E. Spinner, treasury agent, to be paid from the proceeds of captured and abandoned property, for the sum of $30,000, being part of the proceeds of certain property known as the Elgee cotton, collected as captured or abandoned property by said Camp, for an interest therein, said sum being an advance to said Camp on account of his expenditures in relation to said cotton." This order recited that Camp had executed bond with surety to the United States, conditioned that he would repay the said sum on demand of the Secretary of the Treasury,

and fully indemnify the government against all loss and damage, by reason of such payment. In pursuance of that order the sum of $30,000 was paid to him. On the 7th of March, 1866, the further sum of $15,000 was paid to Wm. Prescott Smith (who had acquired a joint interest with the claimant), the order which directed the payment reciting that that amount was "an advance to Smith on account of his joint interest with Camp in said cotton."

The net proceeds of the sale of the cotton, with the interest that had accrued on the bonds in which they were invested—in all, $366,170.83—were covered into the treasury in pursuance of a joint resolution of Congress, approved March 30, 1868.

On the 20th of August, 1868, the heirs and representatives of Elgee brought suit against the United States in the Court of Claims, under the captured and abandoned property act, to recover those proceeds. That suit was pending and undetermined when the present action was commenced. The claim of Elgee's heirs and representatives was established, his loyalty having been shown only by proof that on the 2d day of May, 1864, he took the oath prescribed by President Lincoln's amnesty proclamation of December, 1863.

It was in evidence that twenty-five per cent. of the proceeds of captured cotton was the remuneration ordinarily allowed by the Treasury Department to contractors under the treasury regulations for collecting and bringing in such property.

*Mr. O. D. Barrett,* and *Mr. Benjamin F. Butler* for appellant.

*Mr. Assistant Attorney-General Maury* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court. He stated the facts in the foregoing language, and continued:

Pursuant to authority conferred by the act of March 12, 1863, 12 Stat. 820, the Secretary of the Treasury established and promulgated regulations providing for the appointment of supervising special agents, assistant special agents, and other

agents, for receiving and collecting abandoned and captured property found within their respective agencies, and within the lines of military occupation by the United States forces, except such as had been used, or was intended to be used, for carrying on war against the United States.

One of those regulations provided, that when property was liable to be lost or destroyed, in consequence of its location being unknown to the special agents, or from other causes, and parties proposed, for compensation, to collect and deliver it to such agents, at points designated by them, "supervising special agents may contract, on behalf of the United States, for the collection and delivery to them of such property in their respective agencies, on the best possible terms, not exceeding twenty-five per cent. of the proceeds of the property, which percentage must be full compensation for all expenses, of whatever character, incurred in collecting, preparing and delivering such property at the point suggested." But it was also provided, that, "prior to any such contract being made, the party proposing must submit *in writing* a statement of the kind and amount of property proposed to be collected, the locality whence to be obtained, and all the facts and circumstances connected with it, particularly as to its ownership;" that "any contract made in pursuance of this regulation must be *in writing*, and restricted to the collection and delivery of particular lots at named localities, or, when circumstances clearly justify it, to the general collection and delivery of all abandoned property in limited districts, not greater in any case than one parish or county, and not more than one district to be assigned to one contractor;" and that "should a case arise, in the opinion of the supervising special agent, justifying the payment of a larger percentage than one-quarter of the proceeds of the property, he will make a statement of the facts and circumstances, and the reasons in his opinion justifying such additional allowance, and refer the same to the Secretary for instructions." Regulation XII. By another regulation of the same series it is expressly enjoined, that no liability be incurred or assumed, *or contract be made*, on the part of the United States by such agents except as authorized. Regulation XIII.

These regulations were in force when the claimant made the before-mentioned verbal " arrangement " with Hart, who was merely an assistant special agent, and not, as alleged in the petition, a supervising special agent of the Treasury Department. Under them, only supervising special agents could bind the United States by contracts with parties proposing, for compensation, to collect and deliver captured and abandoned property. They could not allow more than twenty-five per cent. of the proceeds without referring the matter to the Secretary. And no contract of that character made even by them bound the government unless it was in writing. Plainly, therefore, the verbal arrangement, which Camp had with an assistant special agent, was not binding upon the United States, even had it been reduced to writing. It imposed upon the government no legal obligation whatever. *Whiteside* v. *United States*, 93 U. S. 247, 250.

It is equally clear that it was not otherwise understood by the claimant; for, Hart only agreed " to represent the arrangement and business, whatever it might be, to the Secretary of the Treasury," and to inform the latter that he " had assured the claimant, by the arrangement, that the Secretary would allow him twenty-five per cent. of the proceeds of the cotton at least." Camp, evidently, undertook to bring in the cotton and deliver it to the proper agent of the United States, in reliance upon such action as the Secretary of the Treasury, in the exercise of his discretion, might ultimately take touching his compensation, and not at all in the belief that he had a binding contract with the government. He must be held to have known that the Secretary was not compelled to accept the arrangement with Hart as obligatory upon the government, but was at liberty, without violating any legal rights that Camp had, to allow less compensation than was ordinarily allowed under written contracts made by supervising special agents. Indeed, had the Secretary, in view of the non-conformity of the proceedings to his regulations, determined not to allow any compensation whatever, it is not perceived how the jurisdiction of the Court of Claims could have been invoked by Camp, as upon contract, express or implied.

The counsel for appellant rely upon *Salomon* v. *United States*, 19 Wall. 17, and *Clark* v. *United States*, 95 U. S. 539. Those cases differ radically from the present one. In Salomon's case, the property appropriated and used by the government was admitted to belong to the claimant. In Clark's case, the government received the property from the claimant under such circumstances as precluded it from raising any question as to his title. In each case, the United States were held liable, as upon implied contract, to make compensation to the owner. But there is no claim that Camp ever owned the cotton which he delivered at Natchez; as between him and the United States it was the property of the latter; at any rate, he could not legally have withheld it from the United States; its seizure by the government was not a taking of his property; and as he did not conform to the regulations, prescribing the only mode in which the government could become bound, by contract, to make compensation for the recovery of the property, he was not in a position to demand compensation as matter of legal right. Any other view would lead to the conclusion that parties who voluntarily brought in and delivered to the United States captured and abandoned property were entitled, as upon implied contract, to be compensated for their services; for, the services rendered by Camp under an arrangement with an assistant special agent, who had no authority whatever to bind the United States in respect of compensation, present no stronger case, in law, for compensation, as upon implied contract, than if they were voluntarily rendered without such previous arrangement. An interpretation of the regulations in question different from that indicated would have resulted in transferring to the courts the determination of matters, which the acts of Congress committed entirely to the discretion of the Secretary of the Treasury.

But it is contended that the government, having availed itself of the labors of claimant, and the Treasury Department having made two payments on his claim to be compensated on the basis fixed by the arrangement with Hart, that arrangement must be deemed to have been ratified by the Secretary of the Treasury as a contract with the United States, binding

them to allow what was ordinarily paid by the department in such cases, or what was, under all the circumstances, reasonable.

The precise form in which appellant's claim for compensation was presented at the Treasury Department is not shown by the findings of fact. The orders, given in 1865, by the assistant secretary, for the statement of an account and a requisition in favor of the claimant, discloses the fact that Camp had collected the cotton " for an interest therein," and that the payment of $30,000 was intended as an advance to him, on account of his expenditures in relation to the cotton, while the payment of $15,000 to Smith was " on account of his joint interest with Camp in said cotton." But this falls far short of an agreement, by the department, to make further payment. These facts, at most, imply, necessarily, nothing more than that the department was willing, under the circumstances, to compensate him to the extent of the foregoing sums. Whether he should receive any compensation, or how much should be awarded him, were matters which depended, as we have seen, upon the discretion of the Secretary of the Treasury. No one, acting by his authority, had bound the government to make compensation. If the Secretary refused to pay anything, the claimant had no remedy except to apply to Congress for a special appropriation in his behalf. The mere payment of $45,-000 on a claim for a much larger sum, as compensation for services rendered in delivering captured or abandoned property to the government—for which services it was under no legal obligation, express or implied, to make compensation—cannot be deemed a recognition of a legal liability to make further payments on such claim. We find in the record no evidence of any purpose, or agreement, upon the part of the Secretary of the Treasury to make compensation to claimant beyond that already allowed ; and to say that the court may award such compensation as it deems just and proper, is to impose upon the government the obligations of a contract, in respect of captured or abandoned property, which, under the acts of Congress, only the Secretary of the Treasury, or such agents of the Department as he designated for that purpose, had authority to make.

These views make it unnecessary to consider other questions argued by counsel, and lead to an affirmance of the judgment.

*Judgment affirmed.*