## BOWE *v.* UNITED STATES.

### *(Circuit Court, N. D. Georgia. April 29, 1890.)*

**1. CONTRACT—EXTRAS—ARBITRATOR.**
Where a government contract provides that the work done and the materials furnished shall be subject to the inspection of a certain officer, who shall have full power to reject any work or materials which in his opinion do not conform to the plans and specifications of the contract, the contractor can have no extra claim against the government for work done and materials furnished under the requirements of such officer, or for delay in the work caused by such requirements, where the officer made his requirements in good faith, in order to compel the execution of the contract as he understood it, and the contractor failed to make, at the time, any claim for extra compensation for work or material which he now insists were outside of the contract.

**2. SAME—ASSIGNMENT.**
An agreement between a government contractor and one of the sureties on his bond, by which the surety agrees to furnish the money necessary for carrying out the contract, and the contractor agrees to divide the profits with him, does not amount to a transfer of the contract, within the meaning of Rev. St. U. S. § 3737, which declares that the transfer of a public contract shall annul it.

**3. SAME—ACTION AGAINST GOVERNMENT.**
Under Act Cong. March 3, 1887, c. 359, which allows suits to be brought against the United States "upon contract, expressed or implied, or for damages in cases not sounding in tort," an action may be brought by a contractor for extra work done by him under the direction of the government's agent, and for damages for an improper interference by such agent with the fulfillment of the contract.

At Law.

Action by William F. Bowe against the United States under the act of March 3, 1887, (c. 359,) which provides that actions may be brought against the United States "upon any contract, expressed or implied, with the government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort." Rev. St. U. S. § 3737, pro-

vides that no public contract shall be transferred by the party with whom it is made, and that any such transfer shall cause the annulment of the contract.

*Arnold & Arnold*, for plaintiff.

*S. A. Darnell*, U. S. Atty., and *E. A. Angier*, Asst. U. S. Atty.

*N. J. Hammond*, for J. W. Jacobs.

NEWMAN, J. This is a suit brought by William F. Bowe against the United States under the provisions of the act of congress of March 3, 1887, in which he alleges that on the 30th day of June, 1886, the said plaintiff, with J. W. English and M. E. Maher as securities, entered into a written contract with the United States, through its agents, a copy of which is attached. He further alleges that the contract was for the erection of five certain public buildings, to be used as army quarters, near Atlanta, Ga.; and, for the consideration therein named, plaintiff, being a building contractor, undertook the same. The contract refers to certain plans and specifications of the five buildings to be erected, and by one of the terms of the contract these plans and specifications were to govern in the erection of the buildings, and this was the consideration moving the plaintiff to enter into the thing. Plaintiff made his calculations accordingly, and estimated the quantity and quality of the material and work to be used, taking into consideration the character of the buildings to be constructed, and the purposes for which the same were to be used; and also the plans and specifications. Plaintiff computed the time within which, reasonably, said buildings could be completed by carrying out the contract in good faith, and according to a just and reasonable construction thereof. He went so far as to take other buildings to begin after the completion of this contract. Within a reasonable time after the execution of said contract, he began work on the same, and employed a large force of artisans and laborers, and gave orders for material, his guide being said plans and specifications, and consideration thereof, consistent with the character of the buildings to be erected. Soon thereafter the agent of defendant, one Jacobs, whose duty it was to represent the defendant throughout the transactions, began to change and vary the construction of said buildings from the terms of the plans and specifications in many particulars, and added considerably thereto. All of these variations and additions plaintiff made and completed at the special instance and request of said Jacobs, acting as a duly-authorized agent of defendant. Said extra work was for the benefit of defendant, who has since acquiesced in and ratified the same. Plaintiff has performed and completed all his duties under the contract, and defendant has paid the consideration therein stipulated. Defendant has refused, and still refuses, to pay plaintiff for the labor and material used on said buildings which were not contemplated and included in said written contract and specifications. Plaintiff avers that by no reasonable intendment could said labor and material just referred to be included under the said written contract. The discretion reserved therein to defendant's agent, Jacobs, of approving workmanship and material is not an arbitrary discretion,

but was to be exercised reasonably, and in the light of the whole contract, considering the purposes for which said buildings were to be used, to-wit, quarters for soldiers. Said Jacobs, as agent for, and with the subsequent ratification of, defendant, has frivolously, and without reason or just cause, condemned from time to time, during the progress of the work, much material and workmanship, requiring the plaintiff to do the same over in a different way. On account of this plaintiff lost much material and labor, having to replace that which was suitable for the purpose intended by such other material and labor as suited the whims and caprices of said Jacobs; also, at divers times, said Jacobs, acting for defendant, discharged without cause various workmen in plaintiff's employ, and secured others at higher wages, though no more competent than those discharged. The plaintiff further avers that, through the general officious, meddlesome, arbitrary, and arrogant conduct of said Jacobs, completion of the contract by plaintiff was unnecessarily delayed 12 months. All the work done by plaintiff not covered by said plans and specifications was done by plaintiff with the understanding, communicated to defendant, that the same was not covered by said contract. Plaintiff also gave notice to defendant that all rejected workmanship and material which corresponded to, and was a substantial compliance with, said plans and specifications would have to be accounted for to plaintiff, together with all extra cost incurred in making the change. Plaintiff shows that he remonstrated with defendant's said agent, Jacobs, against his unwarranted interference with work and men, which interference had caused plaintiff's payments to be delayed, and the loss of interest thereon. At this time plaintiff had no right of action against the United States in such case, and he was compelled to obey every whim and order of said Jacobs at the risk of losing his contract altogether. Then follows a specific enumeration of plaintiff's charges.

To this declaration a demurrer was interposed, on the following grounds: (1) Because no cause of action was set forth. (2) Because the suit is predicated on the act of congress approved March 3, 1887, whereas the bond on which the thing was based was executed the 30th of June, 1886, and the act is not retroactive in its terms or by intendment. (3) Because there is a joinder in the suit of an action *ex contractu* and *ex delicto.* (4) Because the suit is not verified, and does not pray for judgment, as required by the act of March 3, 1887. (5) Because the plaintiff's remedy, if he had or has one, is an appeal to the quartermaster general, as condition precedent to bringing suit. (6) Because, by the terms of the bond on which plaintiff sues, "all the material furnished and work performed shall be of the quality described in the said specifications, and subject, during the entire work, to the inspection, approval, or rejection of the party of the first part; and the said party of the first part, or his agent, shall have full power to reject any material or workmanship which in their opinion is not in every respect in complete conformity with the aforesaid plans and specifications;" also, because by an express stipulation in said bond, "that no allowance shall be made for extra work claimed to have been done, unless provided for beforehand

**by** written agreement to that effect, specifying the cost of the same;" and a fair construction of plaintiff's suit shows it is an attempt to vary, alter, and add to a solemn written instrument by parol; and because, under said bond and the law, said Capt. J. W. Jacobs could not enter into the verbal covenants set up by the plaintiff. (7) Because, by the terms of the contract, "the United States officer in charge, or his agent, are to have at all times access to the work, which is to be entirely under his control, and may, by written notice, require any contractor to dismiss forthwith such workmen as he deems incompetent or careless."

The first, second, third, and fifth grounds of the demurrer were expressly overruled. The declaration was amended so as to relieve it of the objections made by the fourth ground of the demurrer. As to the sixth and seventh grounds of demurrer, the court made this order: "The court only passes upon the 6th and 7th grounds of the demurrer so far as to determine to hear the evidence before passing upon the legal question raised in the contract, and the effect of the stipulations in the contract set up in the demurrer." Defendant filed a plea of general issue, and plea for payment in full for all work done for it by the plaintiff.

The court has heard evidence at considerable length from witnesses for both plaintiff and defendant on the issues involved, and on the various items embraced in the suit and the subject of contest. The following facts, as applicable to the entire case, may now be stated: From the testimony it appears that the contract price for this whole work was $61,-120. This amount was paid to Bowe, or to his authorized representatives, in full. There were several extensions of the time for the completion of the contract authorized by the war department in regard to which Capt. Jacobs testified as follows:

"This contract was entered into June 30, 1886. The work was commenced within thirty days thereafter. The contract to be completed July 1, 1887. It was not so completed, and on my recommendation the contract was from July 27, 1887, extended to 75 working days, expiring September 26, 1887. In this connection the contractor made verbal request for two months' extension. September 21, 1887, an extension of two months from September 26, 1887, was granted, expiring November 26, 1887. That was the second extension. A third extension was necessary, and that was granted from December 5, 1887, for 50 working days, expiring January 24, 1888. A fourth extension was necessary. On January 24, 1888, to May 3, 1888, work was suspended awaiting preparation of material. May 3d, work was resumed under an extension of 30 days from this date. That is four extensions. After this extension the contract was completed, and the contractor released from his obligation to the United States, June 15, 1888."

It appears that during the latter part of the work on these buildings Mr. Bowe was absent from the work the greater part of the time, and that the control of the work for some time before its completion was practically in the hands of M. E. Maher, one of his sureties on his bond to the government. It appears, also, that there was considerable loss to the contractor by this contract, which loss fell on Mr. Maher, the surety named. About the time the contract between Bowe and the government was entered into, a contract was made between Bowe and Maher, by

which Maher become interested in the contract, and was to receive a part of the profits to be derived from it. This contract was as follows:

"Articles of agreement made this July 2, 1886, between W. F. Bowe and M. E. Maher, both of the city of Atlanta, Ga. Whereas, the said W. F. Bowe having secured a contract with the United States government to build certain houses known as the 'Barracks Houses,' it is agreed that the said W. F. Bowe shall give his personal attention to said work, and superintend the same. The said M. E. Maher agrees to furnish all moneys from time to time, as needed, necessary for the successful and economical completion of the same. All moneys received from the government on account of said work by said W. F. Bowe shall be deposited to credit of said M. E. Maher on barracks account. All checks shall be drawn on said account by W. F. Bowe to the order of M. E. Maher or his attorney. No account shall be made or contract entered into on account of said work for an amount exceeding one hundred dollars without the consent of both parties. It is agreed that the said W. F. Bowe is allowed to draw one hundred and fifty dollars per month for his personal expenses, to be charged to his share of the profits when said work is completed; also that he be allowed fifty dollars per month when said work is completed, to be deducted from M. E. Maher's share of the profits, in consideration of said Bowe's personal attention to said work. That M. E. Maher shall give all personal services that may be required. All transactions and accounts of said work shall be kept in regular books, which shall be open to the inspection of both parties. When said work is completed, the profits shall be divided equally. This agreement shall apply to all contracts made, or to be made, by either party on the government reservation at Atlanta, Ga. All labor required and compensation for the same shall be agreed to by both parties.
                                                                        W. F. Bowe.
                                                                        "M. E. Maher.

"Attest: W. F. Manry, N. P., Fulton County, Ga.
                                            "Atlanta, Ga., Oct. 22, 1887.

Whereas, the said W. F. Bowe has this day given to W. F. Manry a power of attorney for the purpose of raising money, it is not intended to vitiate this contract, but the same is to remain of full force and effect.
                                                                        W. F. Bowe.
                                                                        "M. E. Maher."

During the progress of this work, Capt. J. W. Jacobs, the assistant quartermaster in charge of the work for the government, exercised a constant and careful supervision over it. He seems to have examined with great care all material before it went into the building, and all the work, and each part of it, as it progressed. He also had a superintendent, Mr. Alexander Russell, a practical man, who, under Capt. Jacobs, exercised immediate supervision over the entire work. Capt. Jacobs offered to go anywhere in Georgia with Bowe, at the expense of the government, to examine material, and decide whether it would be satisfactory or not, so that Bowe need not be put to the delay and expense of bringing unsatisfactory material on the ground. He did go with him to a place where sand was to be obtained, and pointed out the character of the sand he would be willing to receive. The orders given and decisions made by Capt. Jacobs were all positive, sometimes peremptory; and yet in every instance, so far as they have been drawn in question here, they seem to have been made in good faith, and with the sole purpose of having these buildings constructed in accordance with the contract,

and to discharge his duty as a superintendent for the government.    Mr. Bowe was frequently informed by Capt. Jacobs that, if any decision made by him was not satisfactory, he could appeal from the same, through him, to the war department; but in no instance did Bowe avail himself of this right, except as to one of the applications for extension, about which he and Capt. Jacobs seem to have differed, and which the secretary of war allowed.    There is a clause in the contract between Bowe and the United States making it subject to the approval of the quartermaster general.

Finding of facts by the court as to each item of plaintiff's claim are now given:

## FACTS A.

*Item 1.* For "cutting tongue on wainscoting.    The specifications required the wainscoting to be "neatly capped;" the manner in which it should be done, except that it should be neatly done, was not specified. The contractor was required by the quartermaster to put a groove in the top of the wainscoting, and to put a tongue on the cap or moulding for the top of this wainscoting.    The complaint is that the "tongue and groove" required by the quartermaster was extra work.    There being no specifications as to how the wainscoting should be capped, the contractor should have understood that it would be required to be well and neatly done.    The specifications for building No. 9 (page 3) provided:

"This building is to be erected in accordance with the accompanying plans, and such additional elevations, sections, and drawings as will be furnished by the United States officer in charge."

When, in the course of building, this wainscoting was reached, the detail furnished by the quartermaster through his superintendent required it to be capped in the manner which furnishes the ground for the claim made in this item.    No complaint was made by the contractor to the quartermaster as to the manner in which this work was required to be done at the time it was done, nor afterwards during the progress of the work, as to this item specifically.

*Item 2:* "Braces under ridge poles, $100."    It appears that the method adopted for supporting the roofs, and the manner in which the timbers were placed, were somewhat different from that provided in the specfications; and, after giving to the testimony of all the witnesses what seemed to be due weight, the evidence does not show that the manner in which the work was done involved any additional expense to the contractor over that which was specified in the plans for the building, so that the finding of facts from the evidence as to this item is that there was no extra cost to the contractor.

*Item 3:* "Screws on inside beads of 280 windows, ten to each, at ten cents per dozen, $230."    The contention as to this item is that for the purpose of fastening the strip of wood, called the "bead," which holds the window in place on the inside, screws were required instead of nails; plaintiff's claim being that, unless otherwise specified, nails only could be required, and that the excess of cost to him of screws over nails was

the amount above specified. I find the fact to be as to this item that the strips called the "bead" were delivered from the mill to the contractor at the barracks, with nails driven in them to be used for fastening them in place. The contractor was required by the government to use screws for fastening the bead, instead of nails. I adopt the testimony of Mr. Russell as to the cost of doing this work with screws or nails, and find that the excess is $41.70. The usual way of doing such work in Atlanta is with nails. There is no evidence as to how work of this character is usually done on buildings such as these erected by the government. The reason for requiring the use of screws is that it frequently becomes necessary to remove the sash, and often, before the buildings are finally completed, to make them fit well, etc.; and the removal and replacing can be much more satisfactorily done when screws are used to fasten the bead. I do not find that any objection was made to the requirement to use screws at the time, or any request or demand that the excess of cost over nails be treated as an extra for which the contractor was entitled to compensation.

*Item 4:* For "extra work on cornices of bake-house, commissary, and service buildings, being glued up, and joints tongued, $50." It is claimed by plaintiff as to this item that he was required to tongue and groove the ends of the planks at the joints on the cornices of the bake-house, commissary-house, and four service buildings. The manner in which this work was required to be done by the quartermaster in charge was unusual, and somewhat more expensive than the ordinary way of doing such work. It is claimed in their testimony by both plaintiff, Bowe, and his superintendent, Compton, that the cost of this work, which they claimed as extra, was $50, but they failed to show how they arrived at this round sum. No calculation as to how this sum was reached is given. Mr. Russell, in his testimony, gives a careful calculation as to the cost of this tongue and groove work in this item, and he puts it at $15.32. I am unable to find in the evidence, and do not recollect, any testimony as to the cost separately of the gluing. I conclude that the cost of the tonguing and grooving was that given by Mr. Russell, $15.32. I am unable to find the cost of the gluing, for the reason stated above; and it is perhaps immaterial, as no objection was made at the time to the manner in which this work was required to be done, and no request or demand that it should be treated as an extra was made of the quartermaster by the contractor.

*Item 5:* "Extra work, plank for plumber to lay pipe on." The claim of the plaintiff as to this item is that the specifications called for pipe to be laid on top of second-story joists. It appears that, in order to get a sufficient fall for the pipes, it would be necessary to cut into the joists; and the plumber in charge of the work suggested to Capt. Jacobs that it would be better to lay the pipes on planks underneath the joists; and that this method was adopted, and the work done in accordance with the suggestion of the plumber. The plumber stated to Capt. Jacobs that there would be no extra cost about it.

*Item 6:* "Changing pulleys on proof-racks, $10." · The proof-rack is a kind of cupboard in which to dry bread.. The doors in front are run by pulleys. It appears, as to this item, that the pulleys which were used in connection with the door or doors of the proof-rack would not work after they were first put in, and the contractor was required to put in pulleys that would work. No complaint was made at the time of this requirement.

*Item 7:* "Catch-pans under dormer windows, $40." It appears that in the construction of dormer windows the slats were so placed in the frame that the rain was blown into the building through these windows, and the water came through the ceiling, and was injuring the buildings. Before they were accepted by the quartermaster, the quartermaster and Mr. Bowe's superintendent examined the matter, and the quartermaster required Bowe to construct certain "catch-pans," as they were called. It seems that a frame was required to be constructed in some way on the inside of the dormer windows, and a tin basin arranged on the wooden frame-work, so that the water coming through the slats of the dormer windows would be turned back upon the roof. It appeared that the dormer windows were constructed according to the specifications, and had been accepted by Capt. Jacobs' superintendent, Mr. Russell. No objection was made by the contractor to the requirement of the quartermaster that he should do this work at the time, or no request or demand that it should be treated as an extra, except as may be inferred from the following letters. The work was worth the amount of $40, as claimed by the plaintiff. A letter is in evidence of the date of November 24, 1887, from Capt. Jacobs to Mr. Bowe, which is as follows:

"ATLANTA, GA., November 24th, 1887.

"*William F. Bowe, Esq., Contractor:* Referring to the tin linings for aprons for dormer windows on the two barracks buildings, you are respectfully informed that some weeks ago, finding that the lining had never been put on as ordered by me several months before, I directed the tinner to do the work, and guarantied him the pay. I do not consider this extra work, but coming under clauses 5 and 10, general conditions of your contract, and you must accept my guaranty, and arrange for the payment on or before next payday. Please acknowledge receipt, and report actions."

To this no reply was received but the following letter was afterwards received from McLain, the subcontractor:

"ATLANTA, GA., June 15th, 1888.

"*Captain J. W. Jacobs, A. Q. M.*— DEAR SIR: Mr. Bowe assumes the payment of the tin safety pans under dormer windows, which relieves the government of that obligation. · JAMES F. McLAIN."

*Item 8:* "Hand-smoothing, sand-papering, and scraping ceilings, 200 squares, at $5.00, $1,000."

*Item 8, (a:)* "Hand-smoothing ceiling of verandas, $900."

*Item 8, (b:)* "Hand-smoothing, scraping, and sand-papering joists and girders of verandas, $900."

*Item 8,* (*c:*) "Hand-smoothing, scraping, and sand-papering inside of girders and columns, 22 squares at $5.00, $110."

*Item 8,* (*d:*) "Hand-smoothing, sand-papering, and scraping ceilings of service buildings, 18 squares, at $5.00, $90."

*Item 8,* (*e:*) "Hand-smoothing, sand-papering, and scraping window and door frames and cases of same, 274 windows, at .25; 41 outside doors, at .40; and 50 inside doors, at .70,—$119."

*Item 8,* (*f:*) "Hand-smoothing wainscoting, 175 squares, at $2.50, $437."

This is the principal item of plaintiff's claim. The complaint is that after the lumber with which this work was done had been delivered where the work was in progress, planed by machinery at the mills, the contractor was required by Capt. Jacobs, the quartermaster in charge, to bring the lumber to a greater degree of smoothness, and better finish, before he would allow it to go into the buildings. The contractor desired to put the lumber as delivered into the buildings, and the quartermaster objected, claiming that the lumber as delivered did not have the finish required by the specifications and the character of the work. The contractor, on the other hand, at the time insisted that all his contracts required was good mill-dressed lumber. The specifications as to the construction of the ceilings do not state how the material used in the ceilings should be finished. The language as to ceilings is this: "All the rooms in the first story must be ceiled with 7-8x5 beaded ceiling, with suitable moulding planted in the angle." One of the provisions of the specifications as to this work was: "The contractors are to provide all materials and labor necessary for the complete and substantial execution of everything described, shown, or reasonably implied in the drawings and specifications, including all transportation, scaffolding, apparatus, and utensils requisite for the same; all materials to be of the best of their respective kinds, and all workmanship to be of the best quality." Another of the specifications is as follows: "In a word, each class of work must present a finished appearance, whether specified on plans or in specifications, harmonize throughout, and be entirely satisfactory to the officer in charge." The testimony shows that mill-dressed lumber, such as was delivered at the government location, is used without further finish in buildings of ordinary character in Atlanta, but that for buildings of a better and more expensive class a greater degree of finish is required to be given the lumber used in work of the character embraced in this item. When a greater degree of finish than that given by ordinary mill dressing is required, it is usual to provide for it in the specifications.

*Item 9:* "Scraping and sand-papering wainscoting, 175 squares, at $2.50, $437."

*Item 10:* "Scraping and sand-papering verandas, $200."

The claim as to the above two items is the same as that contained in Item A and its subdivisions, and the facts as to that item may be applied to these two items.

*Item 11:* "Extra work on stairs, $150."

The facts appear to be, as to this item, that Mr. Russell, Capt. Jacobs' superintendent, selected two men from the contractor's force of workmen to work on the stairs, and the claim is that he required the stairs to be constructed in a way that made them more expensive than they would have been if constructed in some other way, which other way does not clearly appear. No objection was made to the manner in which this work was done, so far as the evidence shows, at the time.

*Item 12:* "Extra cost of Yale locks, $100." The claim as to this item is that the contract provided for certain doors to be finished with "Yale Standard Draw-Lock, No. 961," and that locks of this description were secured by the contractor; but it was found that the barrel was too short to go through the doors, and that, therefore, it became necessary to exchange them for other locks with a longer barrel. In a letter which is in evidence from Mr. Bowe to Capt. Jacobs, dated March 5, 1887, among other things, is this statement: "The Yale lock was an error which I will have corrected." It is claimed by counsel for plaintiff that he did not mean by this to say that it was his own error; but I am unable to concur in this view, and I think he meant to say in this letter, written at this time, that the error was his own, or of those from whom he purchased. There certainly is nothing in this language, or elsewhere in the letter, to indicate that he claimed any error on the part of the quartermaster, or attached any blame to him for the misfit of the lock. Certainly, no objection was made, and no claim for the allowance of any additional cost as an extra was made, at the time, by the contractor.

*Item 13:* "Extra cost of putting on neck mould after column was set, in which manner one hand could put on only six per day, whereas, otherwise, one man could have put on eighteen per day,—an excess of .26 each above cost, and loss of profit of .09; 280 columns at .35, $100." It appears that the contractor desired to put what is called the "neck mould" around the columns before the columns were put in place, and that he was required to put up the columns, and put the neck mould on afterwards. The claim is that it was more expensive to do this work as it was required to be done than in the manner the contractor wished to do it. It appears that the columns were not sufficiently seasoned at the time they were put up, and that Capt. Jacobs allowed them to be placed in position in this unseasoned condition in order to enable Bowe to proceed more rapidly with the work, which he did not think would injure substantially the buildings; and that, if Capt. Jacobs had insisted on the columns being seasoned before they were put in position, it would have retarded the progress of the work, and caused some loss to the contractor. The unseasoned condition of the columns was the reason given by Capt. Jacobs and his superintendent for not allowing the caps to be put on the columns before they were placed in position. No claim was made for extra compensation as to this work at the time.

*Item 14:* "Work on board and wainscoting, $75." The claim as to this item is that Jacobs required Bowe to dry his planks to be used for wainscoting too thoroughly, and that after the wainscoting was put in place the fact that the lumber was too dry caused it to "buckle out," and

that this was caused by the absorption of the moisture by the lumber after being placed in position. The base-board could not, therefore, fit up tightly against the wainscoting, as the board struck only the extended joints, and left crevices between. This necessitated much work in smoothing off the high points so that the base-board would fit up tightly. No claim was made for any extra allowance for this work at the time, and no complaint, so far as can be gathered from the evidence, of any kind was made as to this work.

*Item 15:* "Mould around 44 doors, $100." The claim as to this item is that the contractor was required to put moulding around the frames of 44 doors to hide the cracks left between the door-frame and the brick-work. It appears that the door-frames were put in place before the brick-work around them was done; that this was necessary, for the reason that an iron dowel was to be run from the stone up the frame, which required the frame to be placed in position before the bricks were laid. On account of this method of doing the work the crack was left between the brick-work and the door-frame from one-eighth to one-fourth of an inch wide. The contractor was required to put moulding around the door-frame to hide this crack. This moulding does not seem to have been required by the specifications. The quartermaster states that when he objected to the work as it stood, the cracks showing between the door-frame and the brick-work, that "they" (alluding to the contractor and his superintendent, as I understand) suggested this moulding as a remedy for the defect, and that he accepted it, and made no further objection. To this I find no denial.

*Items 16, 17, 18, and 19* may be considered together. They were for damage to lumber by being exposed to the weather by order of Capt. Jacobs. The contention of the plaintiff is that Capt. Jacobs and his superintendent, Russell, ordered all dressed lumber to be exposed in the open air, stacked up in what is called "wig-wam fashion." It is said that this exposure caused the lumber to warp, and get in bad shape for use, which made it necessary to rework it, at considerable expense to the contractor. The total amount claimed in these items is $1,550. It appears as a fact, from the evidence, that a considerable amount of the lumber to be used in the buildings erected by Bowe was stacked up in what is called "wig-wam fashion" in the open air. It further appears as a fact that this injured the lumber, causing it to warp, and get in bad shape for use. To find as a fact who is really responsible for this is very difficult, in view of the conflicting character of the testimony. It appears that on February 6, 1888, Capt. Jacobs wrote a letter to Bowe, in which, among other things, direction was given as to certain lumber as follows:

"* * * You are also informed that an examination of the commissary building after the recent storm convinces me that the seasoning of the flooring is much retarded by being stored in the building, instead of exposure to the air out of doors, and all lumber so stored must be at once removed, and the practice of turning a building into a drying kiln, and the building of large fires therein, must also cease. During a storm all the buildings must

be closed, and during fair drying weather the windows must be raised or lowered. This precaution to prevent deterioration has been much neglected by you in the past."

In view of the fact that the burden is on the plaintiff to establish his case where there is a conflict by preponderance of testimony, my conclusion is that the only order given by Jacobs as to how the lumber should be dried was that contained in the paragraph given above from this letter. It appears clearly that Capt. Jacobs required the lumber to be exposed to the open air, but not satisfactorily as to how it should be exposed. As to Mr. Russell, Capt. Jacobs' superintendent, and as to whether he gave orders requiring this lumber to be stacked in the manner it was, there is a more decided conflict in the evidence than as to Jacobs. He overlooked the work of placing the lumber in this position, and made suggestions concerning it. He suggested the fact that lumber had been dried for work under his supervision in that way at Hot Springs. The fact is not satisfactorily established by the evidence that he gave any positive orders that the lumber should be stacked in this way.

*Item 20:* "Extra work on mantels, $200." The details of this item are unboxing, setting 32, 1,000 fire-brick, fire-clay, 3,000 common brick, mortar and drayage, iron for mantels, and superintendence. The specifications in reference to mantels was as follows:

"Provide for setting up, in all the rooms having open fire-places, mantels, grates, and hearths, to cost, complete, not less than $20.00 each, the pattern and size to be selected by the officer in charge. Grates must be set in the most approved style, with full backing of fire-brick or soap-stone, as may be directed. In the day mess and wash rooms mantels need not be furnished."

It is claimed by the plaintiff that the cost of the mantels complete, including the setting and all the cost of same, should not, under this specification, have been required to exceed the $20 each named in the specification. The quartermaster construed this specification as providing that the mantels, with everything necessary, should cost not less than $20; but the correspondence in evidence shows that he made a concession to the contractor in this respect, and that the cost of the mantels, without the cost of setting them up, instead of being $680, as it might have been, was only $509. The work of setting the mantels, and the material used in setting, was in addition to this.

*Items 21 and 22.* These two items may be consolidated. They were for 20,000 extra brick in bake-house and commissary buildings more than required by the specifications, at $20 per thousand, $400. The contest of the plaintiff as to these items is that the plans for these buildings showed them to be on level ground, and that the ground sloped so that to comply with the specifications, and to place the floor at the proper elevation above the highest point, required the extra amount of brick mentioned in the above item. It is shown quite clearly by the evidence that at the place where these two buildings were erected a considerable amount more of brick-work was necessary than would have been had the buildings been on level ground. It also appears that the attention of Mr. Russell, Capt. Jacobs' superintendent, was called to the matter,

and that at one time he agreed to allow something for it, but that soon afterwards he withdrew the agreement, saying that he intended to complete this work without any extras. It appears further, from the evidence, that Bowe had ample opportunity to examine the ground where the buildings were to be located, and that he could easily have ascertained this before making his bid. Mr. Bowe was interrogated about this matter:

"*Question.* Didn't you go there and examine this ground before you made a bid? *Answer.* I don't remember whether it was before I bid or not. *Q.* Didn't you examine that map before you bid? *A.* I just say that it may be so; that it may have been. I will not assert that it was. *Q.* Don't you think it was before you bid? *A.* I cannot answer whether it was before or afterwards. If I remembered, I would just as lief acknowledge one time as the other. The time I saw it, I think more particular was for some grading than it was for the ground. *Q.* You knew the map was in existence before you made the bid? *A.* I think so."

There is more of this testimony on this subject. This is enough, however, to show that it is more than likely, even from his own statement, that he examined the ground before bidding. It appears, further, that Bowe's contract with the government was dated June 30, 1886, and that on the 15th day of May, before that, the quartermaster issued a circular in reference to these buildings which contained the following:

"The buildings are to be located on the cites indicated on the map accompanying the plans and specifications, unless otherwise directed by competent authority."

Mr. Bowe was asked if he had read that circular before he made his bid. His answer was: "I more than likely did." This question was then asked him: "I wish it to be understood that you admit you read it?" *Answer:* "I would rather admit that I read it. I did not want to assert that I did not read it, or that I did read it." So that it appears quite probable that Bowe examined the ground before bidding, and, as there was a map indicating the location of the various buildings on the grounds, that he could have ascertained, even if he did not, the exact location proposed for these buildings.

*Item 23:* "Extra cost of painting not required by specification, two coats of hard oil, instead of one, on 117 wardrobes, $158." The facts in reference to this item are somewhat difficult to find. It seems, however, that the contract originally required the wardrobes to have three coats of paint, and that the work was really done in a different way, and a material which Bowe calls "hard oil," and Capt. Jacobs "varnish," was used. The change, it appears, was suggested by the foreman of the contractor. So far as appears from the evidence, no objection whatever was made at the time to the change, nor was any claim made that there should be extra cost or expense attached to it; on the contrary, the only proof on that subject is the testimony of Capt. Jacobs, who states that the foreman told him it would not cost any more.

*Item 24:* "Trimming with red, instead of a different shade of the same color as body, as first ordered, $300." Claim for this item was abandoned by the plaintiff.

*Item 25:* "Extra cost of tinning not required in specifications; amount retained by Jacobs for alleged defects, which retention is in violation of contract, and when there were no defects, $235." It appears, as to this item, that the tin roof of certain buildings erected by Bowe for the government were not satisfactory to Capt. Jacobs because of leaks. The entire correspondence in reference to this item is in evidence, and is as follows:

"ATLANTA, GA., August 3, 1887.

"*William F. Bowe, Contractor:* I consider the roofs of the double and triple barracks in bad condition, and requiring much work before I can accept them. I shall require indisputable proof that all roofs are water-tight before I make a final settlement with you. In doing so I shall require all the standing lock-joints worked over again."

"ATLANTA, GA., August 27, 1887.

"*William F. Bowe, Contractor:* I can see no speedy prospect of the verandas going up, and covered with tin, and, in conjunction with the work, the roof of the main buildings repaired, as indicated in my letter of the 3d instant. You will therefore have tinner commence immediately repairing the roofs of buildings Nos. 23 and 25. I shall wait only long enough for you to get them from Cincinnati in the speediest manner, when I shall order the work done by parties in the city, and charge the cost to you. When I commence the work, I shall complete it, whether your tinners are on hand or not. The ceilings of these buildings are already, I fear, discolored, and injured beyond repair, and I cannot wait your dilatoriness any longer."

To this there is no reply.

"ATLANTA, GA., December 12, 1887.

"*William F. Bowe, Contractor:* You are respectfully informed that late rains develop a number of leaks in the barracks buildings, and that I shall make no final settlement until all roofs are water-tight. Satisfactory evidence of this fact shall be an examination subsequent to a heavy rain."

"ATLANTA, GA., January 4, 1888.

"*William F. Bowe, Contractor:* You are respectfully informed that after having waited some seven months for you to stop palpable leaks in the buildings under your contract, notwithstanding my urgent demands from time to time for you to do so, and being convinced that further patience would be prejudicial to the interests of the U. S., I have this day contracted to have the roofs overhauled and made water-tight for the sum of $220.00. You will therefore cause any men you may have working on the roofs to stop work, as I shall at once take charge of the tin-work under your contract, and complete it."

In response to this a letter was received from Mr. Bowe, which is as follows:

"SAVANNAH, GA., January 6, 1888.

"*Captain J. W. Jacobs, A. Q. M.*—DEAR SIR: Yours of January 4, '88, just to hand. I am sorry I was unavoidably detained at court, and could not be in Atlanta in reference to the subject-matter before you had reached your decision. I knew there were some leaks showing, and the hands had been working on them, and have reported to me that they were stopped, and, whenever any showed again, immediately proceeded to find it, and work on it. From your letter, I judge some leaks have shown again, and we are ready and willing to stop them. I am endeavoring to get away to-night, in which case I shall see you by the time this reaches you. But, to provide against my not

arriving in Atlanta in the morning, I by this mail send your letter to Mr. McLain, my subcontractor for the tinning. The amount contracted by you, $220.00, appears to be very high, tho' of course I am unaware of the amount of work contracted for."

"ATLANTA, GA., January 11, 1888.

"*Captain J. W. Jacobs, A. Q. M.*—DEAR SIR: In reply to yours notifying me that you had given a contract to other parties for $220.00 to repair tin roofs on buildings under my contract, I beg leave to respectfully protest against such action, as being in violation of my contract, and unnecessary, and submit the following facts for your consideration: That my subcontractor on tinning did work on the roofs, and did seek to find the leaks whenever they showed; that the foreman of the carpenters, the subcontractor and boss tinner have often searched under the roofs at night during the rains for the purpose of finding the leaks, and that they were supposed to have been stopped, and that the roof was tight; that an extremely heavy rain showed other leaks, or some of the old ones anew; and that the fact that the roofs are an A No. 1 job is ·a reason why any leaks are difficult to find; and that without allowing me an opportunity or directing me to have my subcontractor repair them, or to have them repaired without reference to the subcontractor, you made this aforesaid contract; that I am now and always have been willing to fully comply with my contract in every respect; that I have never refused to work on these roofs when called on, either myself or foreman or subcontractor or the boss tinner; that all of us have been desirous of making the roof satisfactory; that, furthermore, the aforesaid contract provides for the roof to be reseamed by hand; that I have never been informed that this was your desire, and had no opportunity to refuse to do so; that the hand-seaming of the standing edges is useless, and detrimental to the roof; that there are no leaks showing to come from the standing edges; that the bake-house, commissary-house, and all verandas do not show any leaks, and are perfectly tight; that the hand-seaming as is being done is useless, I am prepared to prove by abundance of evidence. For all which reasons I do most earnestly protest against your action, and hereby refuse to abide by it, and deem it my duty to notify you that the contractors working on the roof absolve me from all liability concerning them, and that therefore I shall consider that part of the work as finished, and accepted by you. Regretting the necessity of this protest, I am,

"Very respectfully, etc., WILLIAM F. BOWE."

The amount specified, $220, was retained by Jacobs from the amount due Bowe under his contract, and applied to having these roofs reworked, as indicated in his letter of January 4, 1888.

*Item 26.* This is plumbing not required by specifications, running gas-pipes from meters to the outside of buildings, $25. It appears that the quartermaster required the contractor to run the gas-pipes from each of the buildings outside the walls of the buildings, so that the connection with the outer gas-pipes could be made there. It is claimed that the Gas Company of Atlanta is willing to run through the walls of the building, and connect with the meter inside, and that the pipe required to go from the inside of the building to the outside was unnecessary and unusual. The testimony of an expert in plumbing, whose evidence was offered in the case was:

"Where it would be very hard to get to it after the house was completed, why, I would certainly run them outside the wall. It would necessitate cut-

ting through the wall, and taking up the floor, to put the pipes in after the house is completed; whereas, before the floor is done, it is a very easy matter to lay the pipe."

*Item 27:* "Extra cost of oven casting, etc., $100." This item was abandoned by plaintiff on the hearing.

*Item 28:* "Grates and ash-fenders, over and above cost specified for mantels, $25." It appears that, when the buildings were about to be turned over by the contractor to the quartermaster, that 19 fenders were missing. The fenders in connection with the mantels, etc., had been ordered by Capt. Jacobs, under the authority given him in the contract, from Hunnicutt & Bellingrath, of Atlanta. When the matter of these missing fenders was investigated, Hunnicutt & Bellingrath claimed to have delivered them. An affidavit was made by their employe, charged with the delivery of these articles at the government reservation, stating that they had been delivered, and describing the fenders, and exactly what he did about them. Thereupon the following correspondence took place between the quartermaster and the contractor:

"ATLANTA, GA., June 18, 1888.

"*William F. Bowe, Esq., Atlanta, Ga.*—DEAR SIR: You are respectfully informed that the preponderance of evidence I have been able to obtain concerning the 19 missing fenders for the barracks buildings under your contract goes to establish the fact that Hunnicutt & Bellingrath delivered them to your agents, and, unless you can furnish evidence to the contrary, I shall have to hold you responsible for them. Please let me hear from you as soon as practicable."

To this Capt. Jacobs received the following reply:

"ATLANTA, GA., June 20, 1888.

"*Captain J. W. Jacobs*—DEAR SIR: Yours of the 18th instant just handed me on the eve of my departure from the city for a few days. Immediately on my return I will undertake to present you the other side of the case.

"Respectfully, W. F. BOWE."

When the contract was closed and final payment was made, the quartermaster reserved $25, which he had ascertained would be the cost of these fenders; and, receiving no further evidence from Bowe on the subject, on the 4th of August he paid Hunnicutt & Bellingrath, who had delivered the fenders, the $25.

*Item 29:* "Delay of carpenter work, $1,500." It is claimed by the plaintiff, as to this item, in his bill of particulars, that he was not allowed by Capt. Jacobs to rush or push his carpenters, and that he was prevented in that way from getting as good work out of them as he would have obtained if he had not been interfered with. The contention is that by this interference the amout named in this item, and more, was lost to the contractor. Capt. Jacobs admits that he frequently objected to work as being improperly done, requiring it to be done over; and the probable result of this was that, in order to do it in a satisfactory way, it would be necessary to do it more carefully, and consequently more slowly. No question seems to have been made by the contractor as the work progressed as to the right of the quartermaster, under the contract, to pass

on the character of the work as it was done. This strict supervision of the work by Capt. Jacobs would undoubtedly cause it to be done more carefully, and, naturally, somewhat slower, than it otherwise would have been.

### CONCLUSIONS OF LAW.

The facts as to each item embraced in this action have thus been given separately, and as briefly stated as possible. The conclusions of the court upon all questions of law involved in the case may now be stated.

1. The first position assumed by the plaintiff through his counsel is that extras may be recovered for on a *quantum meruit*, independently of and outside of the express contract; that "extras are paid for on the same principle as if there were no express contract. Extras constitute a separate account. The government's original obligation was to pay certain money; contractor to work according to certain specifications. If the contractor's work is increased by extras, the government's obligation to pay is enlarged. An order for extras may be considered either as an addition to or enlargement of the old contract, and is a separate contract in itself; but in either case the pay is a reasonable valuation." If the power of Capt. Jacobs to bind the government as to matters outside of the contract could be conceded, and if the contractor had placed himself in the proper position under the contract, during the progress of the work, to claim the various items involved as extras, to so much of the work as could be considered extra plaintiff's contention would be proper enough, and the principle he contends for would be applicable. Other questions are involved, however, which must control the case independently of the general principle thus contended for.

2. In article 1 of the contract under which these buildings were erected is a clause as follows:

"Also, no allowance shall be made for extras claimed to have been done, unless provided for beforehand by written agreement to that effect, specifying the cost of the same."

It is said that this clause is for the government's benefit, and one which the government can insist on seeing carried out, or waive; and that, if extra work is ordered by the government, that the government cannot protect itself from payment by this clause, even though the order be verbal, and there is no written agreement. Supposing that Jacobs had authority to bind the government for the payment of work which was clearly outside the contract,—that he stood in the position of an individual having work done for himself,—the position assumed would seem to be correct. Even though having a contract covering a piece of work, and having a clause in it such as this, it would be unjust to allow the other party to receive the benefit of the contractor's work and material upon a verbal order, and then shield himself under a clause such as this, which at the time of the order he had failed to invoke. To make this principle applicable, however, it would be necessary that the work done or material furnished should be extra, and so understood and treated at the time. The real question then would be, was any work ordered and

done with the understanding at the time that it was outside the contract, or even with notice from the contractor to the officer in charge that the work was extra, and that it would be so treated by him? And then, what was Jacobs' authority under the law? Upon the last-named question, that is, as to Jacobs' authority, the case must come within a well-recognized rule. It is stated by the supreme court in the case of *Whiteside* v. *U. S.*, 93 U. S. 247, as follows:

"The government is not bound by the act or declaration of its agent unless it manifestly appears that he acted within the scope of his authority, or was employed in his capacity as a public agent to do the act, or make the declaration for it."

And, in addition, the court states:

"Individuals, as well as courts, must take notice of the extent of authority conferred by law upon a person acting in an official capacity."

What Jacobs' authority was is discussed later.

3. Further position assumed by counsel for plaintiff is that as Jacobs claimed, as to the various items in dispute, when question was raised about them during the progress of the work, that they were within the specifications, and covered by the contract, that he thereby waived the requirement that Bowe should give notice that these items would be treated as extra, and that the matter be reduced to writing. The effort has been made to analogize it to a case something like that of an insurance policy, and a positive refusal to pay, whereby formal proofs of loss would be dispensed with. This position is clearly unsound. Where the officer in charge required work to be done in a certain way, and, upon the contractor objecting, the officer insisted that the specifications required it to be done as he had requested, and then the contractor proceeded to do the work in accordance with the officer's requirement without further objection, or any notification that the work or material would be treated as extra, what would be the effect? The officer, of course, would have the right to presume that that was the end of the matter, when the contractor acquiesced in his decision. If the officer had notice that the contractor protested, and would treat the work or material as outside the contract, and would claim additional compensation for the same, he would have an opportunity to determine whether or not, under that view of the matter, he would insist on the work proceeding as he had indicated, or refer the matter to superior officers for determination. As Capt. Jacobs was by the contract constituted the arbiter to decide as to the character and the sufficiency of the work as it progressed, when the differences arose as to the manner of doing the work or the character of the material, his decision, of course, became necessary, and the decision thus given would be final, in the absence of notice by the contractor that it would be so considered, and that a claim would be interposed for the work or material as extra. To allow the contractor to apparently accept the decision of the officer, and proceed to do the work in accordance with the decision, and afterwards attack the decision as incorrect, would be a fraud on the officer. It is assumed, for the purpose of this conclusion, that no mistake was made in reference to the work or material, and that

Capt. Jacobs acted in good faith in making his decisions. As cases applicable to this and preceding paragraphs, see *Miller* v. *McCaffrey*, 9 Pa. St. 245; *Cemetery Co.* v. *Coburn*, 7 Md. 202; *Trustees* v. *Platt*, 5 Ill. App. 567. See, also, the following cases cited by plaintiff's counsel as applicable to this general subject: *Amoskeag Manuf'g Co.* v. *U. S.*, 17 Wall. 592; *U. S.* v. *Smith*, 94 U. S. 214; *Clark* v. *U. S.*, 6 Wall. 543; *Mueller* v. *U. S.*, 113 U. S. 155, 5 Sup. Ct. Rep. 380.

4. This leads to the consideration of the question presented by the language used in closing the preceding paragraph, as to what must be shown in order that Capt. Jacobs' decision should not be final and conclusive as to any questions arising during the progress of the work. The provisions of the contract under which this work was done is as follows:

"And it is further mutually agreed to by the parties of this contract that all the materials furnished and the work performed shall be of the quality described in said specifications, and subject, during the entire work, to the inspection, approval, or rejection of the party of the first part, or of such other person or persons as may be designated for such duty; and the said party of the first part, or his agent, shall have full power to reject any materials or workmanship which in their opinion is not in every respect in complete conformity with the aforesaid plans and specifications; and that the said materials or workmanship thus rejected shall be immediately removed from the premises by the party of the second part."

Very broad power was given Capt. Jacobs by this clause of the contract; in fact, it was stipulated very clearly, by this provision, that the work and material should be of a character satisfactory to Jacobs. What would be necessary, then, to impeach Jacobs' decision, and justify the court in permitting the contractor to go behind it, and set up a claim for compensation such as is presented here? In the case of *Downey* v. *O'Donnell*, 86 Ill. 49, a question like this arose, and the conclusion of the court is stated in this language:

"When it is provided in a building contract that the decision of an architect shall be final on all questions of difference arising under the contract, his decision that the work is completed in conformity with the terms of the contract is conclusive until impeached for fraud."

In the same case again before that court, as reported in 92 Ill. 559, the ruling upon this question was unchanged, and the case of *McAuley* v. *Carter*, 22 Ill. 53, cited as authority. In the case of *Snell* v. *Brown*, 71 Ill. 133, a similar question arose over a contract for work in building a railroad. The court uses this language:

"By reverting to the provisions of the contract, relating to measurements and estimates, it will be recollected that the work was to be executed under the direction and supervision of the chief engineer and his assistants, by whose measurements and calculations of quantities and amounts the several kinds of work performed under the contract should be determined, and whose determination should be conclusive upon the parties, and who should have full power to reject or condemn all work or materials which, in his or their opinion, did not fully conform to the spirit of the contract. This may seem to be unfair and oppressive towards appellees. It is nevertheless their own contract, voluntarily entered into, and they cannot evade or disregard it, unless for fraud, clearly proved."

See, also, the cases of *Trustees* v. *Lynch*, 5 Gilman, 521; *Herrick* v. *Belknap*, 27 Vt. 673. The controlling authority as to the correct rule for this court on this question is the case of *Kihlberg* v. *U. S.*, 97 U. S. 398. A quotation from the syllabus will be sufficient to show the scope and character of the ruling:

"A contract between the United States and A. for the transportation by him of stores between certain points provided that the distance should be 'ascertained and fixed by the chief quartermaster,' and that A. should be paid for the full quantity of stores delivered by him. Annexed to the contract, and signed by the parties, was a tabular statement fixing the sum to be paid for each one hundred pounds of stores transported. The distance as ascertained and fixed by the chief quartermaster was less than by air line, or by the usual and customary route. Held, (1) that his action is, in the absence of fraud, or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment, conclusive upon the parties."

It will be perceived that it is stated in that case as a fact "that the distance as ascertained and fixed by the chief quartermaster was less than by air line or by the usual and customary route;" and yet, in the absence of fraud or mistake, his decision as to the distance was held to be final. Applying that rule to the case under consideration, it might be admitted that Capt. Jacobs in some instances required a better class of work or material than was called for by the contract. Yet it would seem that if he acted in good faith, and with an honest desire to discharge his duty to the government, and obtain for the contractor work of the character which he believed the contract and specifications called for, and no more, and, in the language of the case just cited, there was "no such gross mistake as would necessarily imply bad faith, or failure to exercise an honest judgment," his decision could not be attacked. The contention on this point by plaintiff's counsel is that the authority and the discretion vested in Jacobs, by the contract, to pass on the character of the work and material should have been exercised reasonably, and in the light of the contract, and that unreasonable decisions would be void. He cites the following authorities: *Fletcher* v. *Railroad Co.*, 19 Fed. Rep. 731; *Chism* v. *Schipper*, 16 Atl. Rep. 316; *Boiler Co.* v. *Garden*, 4 N. E. Rep. 749, 54 Amer. Rep. 709–711, note; *Chapman* v. *City of Lowell*, 4 Cush. 378; *Tetz* v. *Butterfield*, (Wis.) 11 N. W. Rep. 531; *Hudson* v. *McCartney*, 33 Wis. 331; also the case of *Kihlberg* v. *U. S.*, *supra*. Counsel rely greatly on the case of *Fletcher* v. *Railroad Co.*, decided by Judge PARDEE. Examination of the case shows that decision to be in entire harmony with the cases heretofore cited. There the engineer of the railroad seems to have been by the terms of the contract the arbiter as to the work done for the company by the contractor, and the ruling is that averments that the engineer's decisions were "in bad faith," and that there was "a failure to exercise an honest judgment," and that the decisions were "arbitrary, unreasonable, and wrongful," were sufficient to authorize the admission of evidence. The judge there says:

"And it seems to me with the relation between the umpire and the defendant existing as seen above, that charging the action of the umpire to be ar-

bitrary, unreasonable, wrongful, and in bad faith would include all the charges of fraud, collusion, and gross mistake necessary."

There is no difference, therefore, whatever between this decision and the general line of authorities on the subject; and the same is true of all cases that were cited by the plaintiff on this question, so far as I have been able to examine them.

5. It is insisted on behalf of the plaintiff that some of the heaviest items here are not for extra work, in the sense of the contract, but are for damages resulting from Jacobs' improper interference with Bowe. This states a more proper classification of much of this claim than that in which it has so far been considered. Such, clearly, is the item in reference to the alleged order that the lumber should be placed in the position heretofore named, in the open air, and probably that as to the finish required to be placed on the lumber used in inside work. To such part of the claim as comes more properly under this latter classification it is that the rule just discussed is especially applicable. Where a claim is for an improper interference with the work, or for an improper requirement as to the finish of the work, the rule as to the necessity of showing fraud or mistake would certainly apply. Where, however, the item can more properly be classed as a claim for the compensation for work done or material furnished outside the contract its merit can be tested by ascertaining whether any claim was made at the time by the contractor that it was extra, as well as by the good or bad faith of the officer in his decision.

6. In the course of the argument the act of congress of June 2, 1862, (12 St. at Large, 411,) and its effect on this case, have been discussed. This is an act making it the duty of the secretary of war, the secretary of the navy, and the secretary of the interior, "to cause and require every contract made by them, severally, on behalf of the government, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof, a copy of which shall be filed," etc. It is claimed that even if Jacobs had so intended he had no power or authority to bind the government by contract not in writing. If Capt. Jacobs had ordered an additional house to be built, or a room additional to those provided for in the contract and specifications, or any other piece of work to be done clearly outside of, independent of, the contract, an inquiry as to his power to bind the government by a verbal agreement for additional work done by the contractor would be pertinent; but in the view taken by the court of this case it is unnecessary to determine it. I would be unwilling, however, in any way to commit myself to the position that this officer could bind the government by verbal contracts for material additions to these buildings, or so involve the government in considerable extra expense. The above-named act of congress is discussed in the case of *Salomon* v. *U. S.*, 19 Wall. 17, and in *Clark* v. *U. S.*, 95 U. S. 539. See, also, *Camp* v. *U. S.*, 113 U. S. 648, 5 Sup. Ct. Rep. 687. As pertinent just here it may be added that the last article in the contract between Bowe and the United States is as follows: "Article 8.

This contract shall be subject to the approval of the quartermaster general,"—and the contract was approved the quartermaster general United States army. Was not Bowe by this put on notice that the scope of Jacobs' authority did not extend to making, even in writing, additions to the character or cost of these buildings?

7. Suits such as this, under the act of March 3, 1887, against the United States, must be brought in the district where the plaintiff resides, and the question was raised as to the residence of Bowe at the time this suit was instituted. His testimony must determine that question, as it is the only evidence on the subject, and he testified that at the time the suit was brought he resided in the northern district of Georgia.

8. It is urged that the arrangement between Maher and Bowe, under their contract of July 3, 1886, which has been copied above, amounted to a transfer by Bowe to Maher of this contract, or of such an interest therein as to come within section 3737 of the Revised Statutes of the United States, as to cause the annulment of the contract between Bowe and the United States, and that the effect of the same, as I understand the argument, is to deprive Bowe of any right to use his contract with the government as a basis for this proceeding. I do not think the proper construction of the agreement between Bowe and Maher brings it within the section of the Revised Statute cited. Even if the agreement amounted to such a transfer of the contract, or an interest therein as to bring it within this law, it is too late now for the defendant to make that question. After treating Bowe as the contractor, and responsible as such all through this work, and until its completion, and after an acceptance of the entire work as satisfactory, and a final settlement by the government with Bowe, it certainly ought not to be allowed now to make the objection that Bowe was not a lawful contractor.

9. The only question of law raised in this case, and remaining to be disposed of, is as to what class of suits may be brought against the United States under the act of congress of March 3, 1887. It is immaterial here further to allude to this matter than to state that this entire case arises out of a contract, and the claim of the plaintiff is based either upon an implied promise to pay for work by ordering and accepting it, or for damages to one party of the contract by the improper interference of the other party with its fulfillment. It may be that an exception should be made as to the item claiming that the lumber was ordered to be placed in the position named therein in the open air. But even as to this, if the plaintiff had any rights, they would seem to grow out of the contract, and be based on a violation by Capt. Jacobs of his duty under the contract. It is further contended in this connection that part of this suit, "sounding in tort," cannot be sustained, and that the plaintiff has improperly joined contract and tort. Of course, any part of the case, "sounding in tort" purely, would go out on that ground, but, as has been stated, the whole claim of a right of action arises out of a contract, and under the liberal rule as to the pleading adopted by the court of claims (which, it would seem, should be followed here in actions of this kind) the objection to the pleading and the character of the action can-

not be sustained. *Clark* v. *U. S.*, 95 U. S. 539; *Peirce's Case*, 1 Ct. Cl. 195, and other court of claims cases.

10. It may be proper to add that in the view taken of the facts in this case, and the principles of law controlling it, it is not necessary to determine the effect of the final receipt given by Bowe through his attorney in fact to the government when the contract was completed. There has been some discussion as to its effect and as to Capt. Jacobs' power to bind the government to change in any way the legal effect of the receipt by his statement to Bowe's attorney in fact that the receipt was simply "for so much money." It is immaterial as to what its effect is in view of the rulings of the court in the other questions in the case.

Having found the facts, and stated the conclusions of the court upon questions of law involved, the conclusions of the court as to plaintiff's right to recover, considering each item separately, will now be stated. The following items of plaintiff's claim are without merit, and should not have been allowed if claim for extra compensation had been made and insisted upon at the time and notice given in accordance with the view hereinbefore expressed by the court.

*Item 1.* The manner in which this work was required to be done was not unreasonable. The requirement of the "tongue and groove" was not such additional work to that required by the specifications that it could be fairly claimed as extra.

*Item 2.* The facts do not sufficiently show any extra expense to the contractor.

*Item 5:* "Plank for plumber to lay platform." The statement of facts disposed of this item.

*Item 6:* "Change of pulleys on proof-racks. The quartermaster required that certain doors should be made to work properly. He was right in so doing.

*Item 20:* "Extra work on mantels. The quartermaster was right in his construction of the specifications in question that the $20 complete referred to the mantel, and everything that was necessary for the mantel, as laid down at the building, and he was right in requiring the work of setting, as additional to this, of the contractor. Consequently the contractor was required to do no more than the specifications called for.

*Items 21 and 22:* "20,000 extra brick in bake-house and commissary building." After the ample opportunity and means given the contractor to know the location of these buildings, if he failed to know the point at which they were to be erected, and the character of the ground, it was clearly his own fault, and there was no ground for the demand for pay for brick-work required by the character of the ground.

*Item 23:* "Extra cost of painting," etc., "wardrobes." The change complained of seems to have been suggested by the foreman in charge of the painting, with the statement that it would involve no extra cost. As to the following items the plaintiff is not entitled to recover, because no claim for extra compensation was made at the time the work was done, and no notice given that any of the work would be regarded as extra. As to all of these items the decision of the quartermaster was

acquiesced in, and the work done in accordance with his requirement without any notice to him that his determination of the matter was not final and conclusive. These items hereinafter named, as well as those heretofore named, are controlled by the conclusions of the court heretofore expressed.

*Item 26:* "Running gas-pipes from meters to the outside of buildings."

*Item 3:* "Screws on the inside bead of 280 windows."

*Item 4:* "Extra work on cornices," etc.

*Item 11:* "Extra work on stairs."

*Item 13:* "Extra cost for putting on neck mould," etc.

*Item 14:* "Work on board and wainscoting."

*Item 15:* "Mould around 44 doors."

*Item 8,* (*a, b, c, d, e,* and *f:*) "Hand-smoothing, sand-papering, and scraping ceilings," etc.

It will be perceived from the quotations from one of the specifications in the statement of facts that it was required that "each class of work must present a finished appearance, whether specified on plans or in specifications, harmonize throughout, and be entirely satisfactory to the officer in charge." It would seem that while the contractor knew that a large amount of the work to be done under the contract was inside wood work, and, with such a specification as that just mentioned in the contract, leaving the character to be determined by the officer in charge, that he would have made some inquiry and investigation in advance as to the character of finish that would be required for the work. No such inquiry seems to have been made, and the question as to what was required by the contract and specifications, and a fair construction of the same, seems only to have arisen between the officer in charge and the contractor about the time this part of the work was to be commenced, in addition to the general reason given elsewhere as to the failure of the contractor to claim this as an extra at the time, and to request that it be so treated and reduced to writing, which applies to this item as to the others. It is not at all clear that this lumber was required to be brought to any greater degree of smoothness and finish than the character of the work and a fair construction of the specifications required. It is unnecessary to determine this question, however, as it is held that the claim as to this item is controlled by the general reasons given elsewhere as to failure to make any claim for extra compensation.

*Items 9 and 10.* These two items may be considered together. They are of the same character as Item 8, and are controlled by what is stated above.

*Item 12:* "Extra cost of Yale locks." Even if the mistake as to locks was on account of a defect in the plans, and there was no error on the part of the contractor, he failed to make any claim whatever for compensation for his loss at the time.

As to Item 7, for catch-pans under dormer windows, there is more difficulty, although involving a small amount, than as to any other item in the controversy. It appears from this letter of November 24, 1887, that Capt. Jacobs decided that this work was not extra, in which, it seems

from the evidence, he was mistaken. If these dormer windows were constructed as they seem to have been, in accordance with the specifications, although the result was that the rain entered the building, it does not seem that it was the contractor's fault. It seems, however, from McLain's letter of June 15, 1888, that Bowe acquiesced in Jacobs' decision by assuming the payment of these catch-pans. Why no settlement of the matter was made from the date of Capt. Jacobs' letter (November 24, 1887) to the date of McLain's letter (June 15, 1888) does not appear, and the conclusion must be that in the mean time the matter had been arranged in some way to Bowe's satisfaction, and consequently he assumed the payment of the amount involved. While this item is more meritorious than any other involved in plaintiff's claim, it is subject to the general objection of failure at the time to give any notice of the claim for extra compensation. In addition to this, my conclusion is that Capt. Jacobs acted in entire good faith in making his decision on the subject, and, even though he erred, as Bowe seems to have acquiesced at the time, the conclusion is that even as to this item plaintiff cannot recover.

Items 16, 17, 18, and 19 may be considered together. They are for damage to lumber by being exposed to the weather by order of Capt. Jacobs. The conclusion as to the matter embraced in these items is that neither Capt. Jacobs nor his superintendent, Mr. Russell, had any authority whatever to give the contractor orders as to how his lumber should be dried. Their only authority extended to accepting or rejecting lumber when offered for use in the building. No such authority is given the representative of the government by the contract, and it cannot be inferred from anything stated therein. If Jacobs or Russell had given any such orders as claimed by the plaintiff, and Bowe, feeling bound to do so, had followed them, it is clear that the government would not be bound by their action. It seems from Bowe's testimony that he knew that Jacobs had no such authority as this; but, even if he did not, he can take no advantage from it here. While the facts found hardly render the foregoing statement necessary, it is made as covering the item and disposing of it, even though the facts are as strongly with the plaintiff as contended for.

*Item 25:* "The amount retained by Captain Jacobs for alleged defects in tin roofs." It will be perceived from the statement of facts as to this item that Bowe protested earnestly against this action of Capt. Jacobs at the time. If the action of the quartermaster was not justified by the condition of the roofs, the government will owe Bowe this amount. Bowe's attention was first called to these leaks August 3d, and on August 27th he was warned that the quartermaster would have the work done and charge the same to him. After Bowe's attention was again called to the matter, in December, in January the quartermaster made the contract alluded to. It seems from Bowe's letter of January 6th that he knew that there were some leaks, though he says the hands had been at work on them, and had reported to him that they were stopped. There seems unquestionably to have been great delay on Bowe's part in

remedying the defects in the roof, and I am unable to find that the action of the quartermaster was unjustifiable. Article 4 of the contract between Jacobs, acting for the United States, and Mr. Bowe, has this provision:

"That if the party of the second part, Bowe, fails to comply with the stipulations of this agreement according to the true intent and meaning thereof, then the party of the first part, Jacobs, for the United States, shall have the power to complete the entire work, or any part thereof remaining to be completed, either by special contract, days' labor, or open purchase, as the said party of the first part shall deem to be best for the interest of the public service, and the party of the second party shall be charged with any expense thus incurred by reason of failure on the part of the party of the second part; and the amount of such expense may be deducted from any moneys due, or which may become due, said party of second part."

*Item 28:* "Amount retained for 19 missing fenders."

I am unable to see how Capt. Jacobs could have adopted any other course than he did; that is, to investigate the matter and see who was responsible for the missing articles, and to put the expense of buying them where it justly belonged. He seems to have investigated the matter impartially, and to have endeavored to determine fairly where the responsibility rested. It is impossible for the court to determine here and now whether he decided the matter correctly or not, and, after waiting from June to August for evidence from Bowe on his side of the question, I do not see how he can be blamed for paying over the money as he did to Hunnicutt & Bellingrath. No objection appears to have been made by Bowe at the time to the retention of the money by Jacobs until the matter could be investigated, and no real effort seems to have been made to produce evidence showing that the fenders were not delivered. I fail to find any merit in this item.

*Item 29:* "Delay to carpenter work."

I think there is no claim by plaintiff—there certainly cannot, in justice, be any—that this supervision of the quartermaster, and interference, if it may be so called, was for any other purpose or with any other intent than to hold Mr. Bowe to a strict compliance with his contract as to the character of the work. Bowe had by the contract given him this authority, and it seems too late now to complain of its exercise, unless for bad faith, or otherwise actuated than to faithfully represent the government and obtain for it its just rights in the erection of these buildings.

*Item 24:* "Trimming with red instead of a different shade of same color as body, as first ordered."

*Item 27:* "Extra cost of oven castings," etc.

The two last-named items were abandoned by the plaintiff on the hearing.

It may be proper to add that the court does not desire that the inference shall be drawn that the other items, except those first disposed of above, would have been meritorious if they had been properly claimed at the time. Where this has been clearly true it has been stated, and where not alluded to it was because they were controlled by other rea-

sons, irrespective of the merits of the particular item if it had been properly urged when the question arose during the progress of the work. I have thus endeavored to find the facts in this case and the conclusions upon questions of law involved, as well as the conclusions as to each item of the plaintiff's claim. The court has been very greatly aided in all this by the careful and able argument by the counsel on both sides. The court has been specially benefited by the carefully prepared argument and brief submitted by the junior counsel for the plaintiff, enabling the court, as it has by its references to the testimony, to find without difficulty such parts of the voluminous testimony in the case as have been most material in its consideration. The conclusion in this case is that the plaintiff is not entitled to recover in any amount, and that the judgment must be rendered in favor of the defendant, with costs of suit.