# CARLOS EREÑO

*v.*

# THE PEOPLE OF PORTO RICO.

---

**San Juan, Law, No. 230.**

1. Individuals as well as courts must take notice of the extent of authority conferred by law upon persons acting in an official capacity.

2. Oral statements made before a written contract is executed cannot be used to vary the terms of the latter.

3. The commissioner of education is the only official with power to vary the terms of a written contract to build a schoolhouse.

4. When alterations are merely assented to, but there is no agreement as to value and cost of the same, the presumption is that no increased cost was contemplated.

Ereño v. People of Porto Rico.

5. The circumstances connected with the giving of a receipt in full may be proven to show a mistake, if one there was.

Opinion filed December 11, 1906.

*N. B. K. Pettingill, Esq.,* attorney for plaintiff.

*Attorney General of Porto Rico,* for the People of Porto Rico.

RODEY, Judge, delivered the following opinion:

In this case, the parties, by proper stipulation, waived a jury and tried the cause before the court. Much of the evidence had been previously taken by deposition, and that, together with what was taken orally on the recent trial, the pleadings in the case, and the exhibits, raises all the issues of law and fact now to be passed upon by the court.

The action is an ordinary suit in assumpsit to recover $2,466 alleged to be due the plaintiff from the government of the island of Porto Rico on account of the fact that the plaintiff built a schoolhouse at Fajardo of dressed stone instead of brick, as was contemplated under the contract between the parties.

The declaration alleges that a written contract was entered into in December, 1901, but the fact appears to be from the instrument itself in evidence, that it was entered into on June 29th of that year. The contract price of the building was $16,000, but that the plaintiff alleges that the agreement was verbally modified with the full knowledge and consent of the

Note.—As to the admissibility of parol evidence to vary, add to, or alter a written contract, see note to Durkin v. Cobleigh, 17 L.R.A. 270, and note to Fire Ins. Asso. v. Wickham, 35 L. ed. U. S. 860.

defendant through its commissioner of education, so as to per-
mit the use of stone instead of brick in the construction thereof,
and that, on account of the increased value of the building to
the defendant and the increase in the cost of construction by rea-
son of the modification made, the difference was to be paid to
the plaintiff in addition to the contract price. That after this
verbal modification with the full knowledge and consent of the
defendant, as it is alleged, the plaintiff proceeded with the con-
struction of the said building, and that the additional cost was
the sum aforesaid which he sues for. It is further alleged that
the plaintiff fully carried out and performed his part of the con-
tract, including this alleged modification thereof, but that the
defendant has refused to do so, but has paid the full price men-
tioned in the contract, of $16,000, and refuses to pay the said
alleged balance.

The declaration then proceeds to declare for the balance due,
under all of the common counts, as fully as is the custom in a
common-law suit in assumpsit; that is, on account stated, for
work done and materials furnished, for money paid, laid out,
and expended, and for money had and received, etc.

After some preliminary pleading, the defendant by its attor-
ney general, by leave of the court first had, filed several pleas,
setting up in detail its alleged complete defense to the whole
cause of action, the substance of which pleas is:

(1) Denying each and every allegation of the declaration.

(2) Alleging the entering into the contract by the parties, and
that no modification or change in the construction of the build-
ing was in fact, or could be, made under the terms thereof that
would increase or diminish the cost of the work, except upon
agreement in writing by the contracting parties, setting forth
the changes to be made and the prices to be paid therefor, and

(3) Alleging that on the 3d of September, 1902, a complete settlement was had between the parties under the contract and in the premises,—the plaintiff having, up to that time, received, under said contract, in various partial payments thereunder, the sum of $14,909.14, and on the latter date having received and accepted in full payment in the premises, the sum of $1,090.86.

As the parties went to trial without objection on these pleadings, it will be assumed that a replication denying the pleas was considered as filed, especially as the proofs thereafter introduced were directed to an issue thus raised.

The contract for the construction of the building is quite specific in its terms, is signed by Dr. Brumbaugh for the island and by plaintiff on his own account, and is accompanied by the signed proposal of the plaintiff, offering to do the work for $16,000. There was evidence in the case tending to show that plaintiff had never submitted a bid under any advertisement calling for the same by the island, but, if he did not, he certainly signed one of the blank proposals just before entering into the contract, as the paper is annexed to the contract now in evidence, and is signed by him. The contract is further accompanied by the specifications in detail and the bond of the contractor, as well as by a copy of the advertisement purporting to have been issued, and all of which, under the terms of the contract itself, are made a part of it. These papers are voluminous and go into all the details connected with the work, and have the signatures of the parties on them at all proper places.

The material portion of the actual contract, which, it is contended, concludes the plaintiff, reads as follows:

"If, at any time during the prosecution of the work, it be found advantageous or necessary to make any change in the specifications as to character and quantity, whether of labor or ma-

terial, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the qualities and prices of both materials and labor thus substituted for those named in the original contract: Provided, that no payments shall be made unless such supplemental or modified agreement was signed before the obligation arising from such modification was incurred.

"No claim whatever shall at any time be made upon the commissioner of education of Porto Rico, by the party or parties of the second part, for or on account of any extra work or material performed or furnished, or alleged to have been performed or furnished, under or by virtue of this contract, and not expressly bargained for and specifically included therein, unless such extra work or materials shall have been expressly required in writing by the party of the first part or his successor, the prices and quantities thereof having been first agreed upon in writing by the contracting parties."

The evidence in the case as to whether or not there ever was any binding modification of the contract in question entered into between the parties is quite conflicting. It appears that plaintiff is a very intelligent man, and a contractor for such buildings of considerable experience. That he had theretofore constructed schoolhouses for the island at Cayey, Aibonito, Manati, and two in Ponce. It appears also that he speaks only Spanish, and that his transactions with the department were in that language when any of the officers could speak it and through an interpreter when they could not. The substance of his own evidence and claim is that Dr. Brumbaugh, who was then the commissioner of education for the island, had called him from

Manati to San Juan with a view to seeing if he would take a contract to build the schoolhouse in question, as the department had failed to receive any bid less than $17,000 for its construction, under an advertisement theretofore issued, and which sum was considered too high. That the commissioner asked him if he would do the work for $16,000 and he answered that he could not. That the commissioner then went on to tell him how he could obtain materials at Fajardo and that the main materials were practically all there, and that he (Brumbaugh) had ordered bricks made there, fourteen thousand of which were already manufactured, and that they were cheap, and that plaintiff could easily do the job for $16,000, and urged plaintiff to accept it, because he, the commissioner, had made a promise to the people of Fajardo to construct them a schoolhouse within a short time, and that, in any event, he, the commissioner, would see to it that plaintiff did not lose any money on the job. That in view of these facts, plaintiff accepted the offer to do it for $16,000, and then and there signed all necessary and proper contracts and papers in the premises. That plaintiff then proceeded to Fajardo. That when he arrived there, he found there was practically no material there,—that the bricks were not made. That later, on his return from Fajardo, he met Mr. Post, who was the supervising architect of such structures for the island, and told him that he could not continue the work, for lack of material, and that it would be much more costly than the price mentioned. That then Mr. Post authorized him to construct it of stone; but that plaintiff, when he figured up the cost of the stone over what it would be in brick, stated that the price must be increased; to which he says Mr. Post replied to continue the work anyway and at the end of it the difference in cost of stone over brick would be paid for. That plaintiff then

gave instructions to the local inspector in actual charge of the work, telling him to keep an account of the difference in the cost of the material, so that, at the end, the additional cost would be known. That he completed the work and got his $16,000 therefor and then spoke to Mr. Post as to the excess of $2,460 or something like that. That he at this time also spoke to Dr. Lindsay, who had superseded Dr. Brumbaugh as commissioner in the meantime, about the matter, and that Dr. Lindsay answered that he knew perfectly well that the building had cost more, but that he could not pay any additional money on account of it without legislative authority. That there was no money appropriated for such purpose. That then he went to the local assembly and they replied that they had nothing to do with it, and that next he went to the executive council, and thereafter to the governor, all with the same result. And that finally he brought this suit to enforce what he considers to be his rights. On cross-examination he admitted that he took no note of the contract on entering into it, save of the time given to finish the work and the material required under it, and that he carried off copies of all the contract papers with him. That he visited the work himself probably as many as ten times during its progress, but had a man in charge who represented him as against the local supervisor on the ground. That all the orders he ever received about the building came direct from the architect, Mr. Post. That when he found he could not do the work for lack of brick, he himself proposed the change to stone to Mr. Post, but that at this time he had gone on with the work and built the rubble foundation out of stone which the island had permitted him to take free of cost out of a near or adjoining property which the island owned. That the stone out of which the main portion of the building was constructed was brought in lighters from a

Ereño v. People of Porto Rico.

neighboring island at considerable cost, and dressed on the ground. That the only person who promised to pay him for the difference in the work was Mr. Post, the architect, but that Mr. Post said he, plaintiff, could not claim it until after the building was finished, and that then it would be paid. That he never spoke to the commissioner, Dr. Brumbaugh, personally on this subject of the increased price, but wrote him about it after the commissioner had left the employ of the island and returned to Philadelphia. That no supplemental contract in writing was entered into for this extra work or cost. That he accepted the money and signed the receipt for the final payment under the contract, but at the time was ignorant that it contained a statement that it was in full settlement, although his claim for this extra service had been pending for some long time before that.

Apart from the documentary evidence, the only other witness who tends to corroborate this evidence of the plaintiff in any way is that of Mr. Alberto F. Martinez, who was the interpreter that intervened between the parties at the time of the signing of the contract, and he testifies in substance that he is an employee of the department of education, or at least was at the time he testified. That Dr. Brumbaugh was the commissioner, and that the witness is general field superintendent of public schools and knows the plaintiff since 1901, because the latter was a contractor of school buildings for the island. That witness was interpreter between the parties at the time the contract for the schoolhouse at Fajardo was entered into, and that he remembers, "that the Fajardo building was advertised for bids, but not awarded to anybody." For what reason he does not know. That plaintiff was then sent for, and Mr. Post offered him $16,000 to construct the Fajardo schoolhouse. That then Mr. Post, the witness, and the plaintiff went into the commis-

sioner's, Dr. Brumbaugh's, office, and the latter tried to convince plaintiff that he ought to accept the offer, promising him that he would lose no money in the transaction, and that there was plenty of the main material ready at Fajardo for the building. That plaintiff accepted the offer of $16,000 and went away after signing the contract. That about a month and a half or two months after this, plaintiff came into the office again and notified Mr. Post that he could not continue the work on account of lack of material, claiming there were no bricks obtainable, and that the only thing he could do was to build it of stone, and that Mr. Post said not to stop the work, but to go ahead and use the stone, promising him that he would do his best to settle the matter; and that as soon as plaintiff should have finished the building, he should present a claim showing the difference between the cost of stone and brick, and that he, Mr. Post, would see that it would be paid. And that then plaintiff went away, and that witness knows nothing further, and he only knows this because he acted as interpreter between the plaintiff and Mr. Post. On cross-examination, witness stated that the contract price was $16,000. That plaintiff signed the contract voluntarily. That witness heard Dr. Brumbaugh say there was enough main material on hand at Fajardo, but that he does not know whether the material referred to was bricks or not, and as to the statement that Dr. Brumbaugh would not permit plaintiff to lose anything, witness stated that Dr. Brumbaugh said he was very much interested in having that building erected at Fajardo, and assured Mr. Ereño that the latter would lose no money by accepting the contract. That it was a mere assurance, and that the statement was made in answer to plaintiff's objection that the price was too low. When asked if Dr. Brumbaugh's words were not: "Oh, you won't lose anything under your contract,"

the witness answered: "Very probably they were. I do not remember his exact words. Anyhow, he assured him that he would not lose any money." That a couple of months later when plaintiff came in he said there was enough stone to erect the building, but that there was a difference in the cost of it over brick. That the suggestion to use stone instead of brick came from plaintiff on the sole ground that he could not obtain brick.

Much oral testimony was introduced in the case with reference to there being no sufficient quantity of brick for the building at Fajardo and with reference to there being a plentiful supply at Ponce and San Juan, and as to its price, and as to the difficulty of transporting it in ox carts or lighters from Ponce or San Juan to Fajardo. As to all this, the plaintiff claimed that it could not be done as cheaply as stone would be, which could be procured much nearer, yet that the stone was more costly than the local brick would have been, had it been obtainable; and that weather conditions and other causes prevented the brick from being made at Fajardo. In the view we take of the case, it will not be necessary to consider this conflicting testimony.

Copies of letters were introduced, tending to show that Mr. Post, the architect, wrote to Mr. Bunker, the supervising architect on the ground at Fajardo, on November 11, 1901, or about four months after the signing of the contract, notifying Bunker that Ereño, the plaintiff, had been in to San Juan with the avowed purpose of filing a claim for additional money to complete the building in stone or to be allowed to finish it in brick from the second story up. In which letter Post says:

"The latter (finishing in brick from second story up) I would not consider for a moment, and as regard to the former (filing a claim for additional money to complete the building in stone),

Ereño v. People of Porto Rico.

I told him that he made a proposition to me to construct build-
ing entirely of stone from ground up, and that I intended to hold
him to his own proposal.  I also explained to him that any claim
which he might now make against the insular government should
not receive attention for the reason that he could make no just
estimate of the amount necessary to complete the building over
and above his contract at this period and that it was useless for
him to submit the claim at this time.  The fact remains, how-
ever, that this claim will eventually come in and it will be nec-
essary for us to be in a position to furnish any information re-
quired by the governor or the executive council or whoever may
have charge of the settling of the claim, and for that reason I
must request that you make careful notes of all events happen-
ing in the job, of the cost of stone at the quarry, at the playa, on
the ground, in the rough and dressed, and also placed in the
building.  In securing figures on transportation, do not consider
anything positive, facts or information, that you have any doubt
is true.  Keep a close record and we will be in a position to fur-
nish any information that may be requested later.  Mr. Ereño
informs me that the lumber for the second story left here Sat-
urday.  Drive the work as fast as possible or you will not be
able to complete the building by the middle of December, at
which time I hope it will be done."

A letter from plaintiff to Dr. Lindsay, of date June 14, 1902,
is also in evidence, a translation of which is as follows:

"The undersigned, contractor for the construction of the
Fajardo graded school, respectfully represents:

"In the month of June I bound myself with Mr. Brumbaugh
to build the Fajardo school for the sum of $16,000, building to
be of brick.  Dr. Brumbaugh assured me that I would not lose
any money, for I did not want to close the deal, believing that.

Ereño v. People of Porto Rico.

the sum devoted for the purpose was insufficient, but he assured me that I would not lose, as he would not permit it.

"I was informed by the department that there was enough material at Fajardo, especially bricks, and that there were some 80,000 of them ready for the kiln. I went to Fajardo and found that there were not enough bricks, and that if I waited I would lose a lot of time; so I proposed to the department to build the schoolhouse of stone, instead of brick.

"Now, Mr. Commissioner, it is. I think, a question of strict justice, and I trust that you will agree with me that it would be only fair to pay me the difference in cost from brick to stone. To this end, I am pleased to enclose a statement showing the difference between one and the other, amounting to $2,466.44. Knowing your sense of justice, in addition to the promise made by Dr. Brumbaugh, I have no doubt that you will kindly see from a just joint of view that I am only claiming what is lawful."

There are many other letters from Bunker, the local supervisor, and others, to headquarters here at San Juan with reference to calculations, etc., and quantities of material, that we do not think it material at this time to set out. But the following letter from plaintiff to Dr. Brumbaugh, when the latter had left the island and was living in Philadelphia, we think is material:

"I have thought of writing to you, but until now I take that pleasure, compelled by the circumstances.

"I have no doubt that you will remember that when I undertook the work of building the schoolhouse at Fajardo, you told me that I would not lose any money in the building of said house. I took up the contract because it was assured to me by the architect that there was a great number of bricks at that time

in Fajardo, but when I went there to start the work I found that there was not a single brick. You had told me that you assured me I would lose no money if I built the schoolhouse for $16,000, and that you would see that I would not lose at all. Well, as I found no brick, I did the work with stone, and have delivered a building far better than the one I would have if made with brick. Now you know very well that there is a vast difference between brick and stone, and I have applied to the commissioner of education to give me the difference in cost, as I lose in the transaction over $2,000. His answer was that all your promises by word did not count, and that is the reason why I write to you, asking you to kindly write to me and tell me if it is true that you promised me that you would see that I would not lose any money. I know that you are a just man and that you are equitable in all your deeds, and therefore I have no doubt that you will kindly help me in this, as I do not think it is right for me to lose that amount."

Also Dr. Brumbaugh's reply, under date of October 6, 1902, to plaintiff's letter above:

"Your favor recd. and I beg to say in reply that I recall the day we opened the bids for Fajardo schoolhouse. Your bid was over $17,000. I rejected all because I knew that the building was not worth that much to the island and I was very anxious to do what was right between the people and the contractor. Then, when I rejected all, you and I and Mr. Post had a talk in which we gave it as our opinion that the building was worth not over $16,000, and I offered you the contract at $16,000. You took it and afterwards I learned from Mr. Post that you had decided to build it of stone. I am quite confident that I never pledged the island to any additional sum. In fact I could not. The payment was made in a contract duly made and the amt. was set

forth in the contract. I could have no way to draw one cent from treasury save on warrant based on contract, and the auditor would be very sure, and rightly so, to deny any payment not warranted according to law.

"I am as sorry as anyone can be if you lost money on the contract. I still feel that it was a fair price for the work and that I did all I agreed to do in the matter."

Dr. Brumbaugh in his deposition totally denies ever making any agreement of any kind with plaintiff other than that set out in the contract, and denies that anybody else had power to in any manner change the contract without his consent. The substance of his deposition is as follows: That he is forty-three years of age and a professor in the University of Pennsylvania. That he lived at the time in question in this suit in San Juan, Porto Rico, and was commissioner of education there. That as such commissioner he entered into contracts for the erection of school buildings, etc. That he entered into the contract in question with this plaintiff. That he had agreed with the people of Fajardo to provide them a ten-room school building, for which purpose he had set aside a maximum allotment of $16,000, which sum was based on a careful estimate of the cost of such a building at that place, made by the architect of his department, Mr. Post. That specifications thereunder were drawn and an advertisement published for bids. That when they were opened, they all exceeded the maximum allotment by more than a thousand dollars. That Mr. Ereño, plaintiff, was the lowest, but still exceeded $17,000. Whereupon witness announced to them all that the department rejected all the bids. That all the bidders then retired from witness's office, but that witness understood from Mr. Post that the plaintiff went with said Post to the latter's room in the department

and talked with him concerning the cost of the build-
ing. That in about half an hour, plaintiff and Mr. Post, with
the interpreter, returned to witness's office, and that, at Mr.
Post's suggestion, witness told Mr. Ereño frankly the maximum
sum which the department would pay for the building. That
witness probably did say to plaintiff at that time that the depart-
ment was convinced the building could be erected for $16,000,
and that it would not pay a dollar more than that sum therefor.
That before the interview ended, plaintiff agreed to accept the
contract to erect the building for that sum. Whereupon, the
same was duly drawn and executed. That witness cannot re-
member any detailed conversations, but he has no doubt that he
frequently urged plaintiff to hasten the completion of the school
building, but that he is certain the contract was never referred
to after it was signed. That plaintiff never made any demand
on witness for reimbursement for additional work on said school-
house until after witness had resigned the position of commis-
sioner of education, and that this statement was made in a letter
to him, dated September 16, 1902 (supra), and that his answer
was sent to plaintiff from Philadelphia, October 6, 1902
(supra). That this is the only demand that plaintiff ever made
upon witness in that behalf. That no modification of the con-
tract in question was ever made while witness was commis-
sioner. That it was the duty of the architect, Mr. Post, to draw
these contracts under the direction of the attorney general and
submit them to witness for his approval, and that when a con-
tract was duly executed, it was Mr. Post's duty to compel the
contractor to comply with the same, and that Mr. Post had no
power to enter into a contract or to change the same save upon
witness's approval. That he, witness, told Mr. Post, when the
latter mentioned the matter to him, that if plaintiff could build

this schoolhouse of stone of a quality and pattern exhibited by Post to witness in a sketch, with a sample of the stone, he, witness, would gladly consent to the change from brick to stone, provided only that this change in no way increased the cost of the building to the people of Porto Rico. That no other modifications were made or consented to by witness with his knowledge or approval, orally or otherwise. That the change from brick to stone was due to the fact that plaintiff, through Mr. Post, had reported to witness that the cost of brick at Fajardo was more than plaintiff had anticipated, and he therefore requested permission to substitute stone for brick, which substitution would save some money to him, and in no way prejudice the quality or utility of the building. That as an accommodation to the plaintiff and without jeopardy to the island's interest, and particularly in order to hasten the completion of the building, because bricks were not immediately available at Fajardo, witness gave his consent to plaintiff's request. That all detailed direct dealings after the making of the contract with the contractor took place between the latter and Mr. Post, whose business it was to see that the contract was carried out, and that any interference by witness was simply as a guidance to Post.

Dr. Lindsay, in his deposition, states that all the conversations he ever had with plaintiff previous to about one year after signing the contract was urging him to complete the building. That in the month of June, 1902, plaintiff made a claim for $2,466.-44 to him, stating that it was the loss he had incurred on the contract, due to the change in the specifications by substituting stone for brick, but that he produced no supplementary contract to support such demand. That witness asked him to put it in writing, which he did June 14, 1902, and that after careful examination of all records in the office, witness refused to ap-

II. PORTO RICO.—20.

prove any additional payment over and above the original contract, and so disallowed the claim, but told plaintiff that if he thought he had any claim in equity, he should present that to the legislative assembly. That plaintiff claimed that Dr. Brumbaugh and Mr. Post, the architect, had promised him additional compensation. That he then called in Mr. Post, who, in plaintiff's presence, denied that any such promise had been made by him, either then or at any previous time. That several times afterwards, when asked about it, Mr. Post emphatically denied the making of any such agreement. That witness then wrote Dr. Brumbaugh, asking whether he had made such a promise, and received for answer a positive denial of the making of it. That witness went into three exhaustive examinations of the matter of this claim in the records in his office and of the plans and specifications, all of which led him to the same conclusion, that plaintiff had been paid in full; and that witness told plaintiff repeatedly that he had no legal claim for additional compensation, and that witness had no power to draw on any funds to make any payment to him. That as a personal favor to plaintiff, witness at one time caused Mr. Post to make a calculation of the difference in cost between the stone building and what a brick one would have cost, and that the calculation showed a probable difference of $1,204.

Mr. S. B. Bunker, thirty years of age, and a civil engineer in New York city, who was the supervising architect of this building when the work was done, testifies that stone was substituted for brick at the request of the contractor on account of the shortage of the brick supply. That there were only some 10,000 bricks ready when plaintiff arrived at Fajardo to begin the work and about 20,000 more unburned, and that then, in order to facilitate the construction of the building, plaintiff requested that

he be allowed to substitute stone for brick. Witness goes on with a lot of testimony as to the facility of getting bricks at other places at this time, all of which, as stated, we regard as immaterial here, save as tending to prove that bricks were obtainable, but perhaps at an increased price. This witness also testifies to a lot of delay in the construction of the building and a lot of loss to the contractor resulting from facts showing negligence on the part of plaintiff in not supplying his men with tools and material in proper quantities. That when the building reached the level of the second floor, plaintiff had a talk with witness about the stone costing much more than he expected and of plaintiff's intention to see if the department would allow him to complete it with brick, to which the witness replied that such a proceeding would spoil the structure. And that plaintiff at this time said something to the effect that the department should reimburse him for any loss occasioned by substituting stone for brick. That Mr. Post, the architect, gave his instructions direct about the building to plaintiff and never gave any through witness, and that nobody but Mr. Post interfered in plaintiff's conduct of the work, save such supervision as witness gave from time to time.

Charles G. Post, the architect, deposed that he is thirty-seven years of age, an architect, and lives at Dobbs Ferry, New York. That he has had twelve years' experience in his profession. That his duties when on the island were those of architect, business manager, and supervisor of construction. That he drew plans for all buildings erected by the department, wrote the specifications, prepared the contracts, investigated the sureties, etc., and employed a corps of assistants about the work. That he had absolutely no authority over contractors. That he could not compel a contractor to remove material or correct work,

and that if he did choose to correct any of the work, he could only do so by holding up the next payment. That the commissioner of education was the only person who could make or modify contracts for such work, or, in his absence, the acting commissioner. That he does not recollect whether he had any preliminary talks with plaintiff about this building, and that if he had any, they took place at the department through an interpreter, either Mr. Hernandez or Mr. Martinez. That he cannot recollect any particular conversation at this time. That plaintiff often called on him between advertisements and bids to get particulars as to the site, materials, time, etc. That at the time of signing the contract in question, plaintiff wanted to increase the amount of his bid $500, making the contract price $16,500, but that this could not be considered by the commissioner. That from time to time plaintiff reported he had great trouble in getting bricks. That many ordered by him had been destroyed by rain before baking, and that it was impossible for him to make any headway. After considerable delay, witness recommended to the commissioner that plaintiff be allowed to use rubble stone for foundation walls, which was approved, and later plaintiff found stone on property belonging to the island, which proved satisfactory, and the commissioner authorized him to use it, making no charge for the same. This concession, it was thought, would permit him to go ahead with the work and give him time to secure a supply of brick to carry forward the work contemplated, and he was so advised. That the work was started and that in a few days plaintiff called at the department with a proposition to use limestone throughout. That the department had no desire to substitute stone for brick. That it appreciated the fact that such change would cost the plaintiff more money than if built of brick, and so advised him; and that, in addition, the department

did not propose to consider any proposition involving additional cost for the building. That plaintiff left, returning again in a few days, advancing the same proposition, that he would perform the work entirely of limestone without extra compensation. That this proposition was submitted to the commissioner, and, as it removed all difficulty in the way of advancing and finishing the work, and was satisfactory to the contractor, it was accepted. That later in the year plaintiff again appeared for permission to use brick from the second story level to the roof. That this proposition was rejected, as such a combination was unknown to the building world. That witness did all the preliminary work of plan making and estimating, and that the cost of the building, after full investigation, was estimated at $16,000. That witness has no recollection of any other conversation at the time of signing the contract, save plaintiff's effort to raise the price $500, but this the commissioner would not agree to. Witness gives a lot of evidence as to the possibility of procuring brick at other places, which we regard as immaterial in the view we take of the case. He further testifies that the contract limit was three months to complete the job, and he is sure that, under all the circumstances, an extension of three months additional ought to have been sufficient, but that it took a great deal longer, and that he was in receipt of reports from his inspectors on the ground from time to time, that the contractor failed to furnish materials and the work was being delayed. That the stonecutters could have done a great deal more work if stone had been made available to them, without additional cost, and that this would have resulted in more stone being set and would have enabled the employment of many more men to complete the job quickly and economically. That the woodwork was also delayed, and that the contractor certainly lost a lot of money by these de-

lays in the stonework and woodwork, occasioned by his own negligence, having to keep many men on salary, maintain his insurance, pay traveling expenses, etc., during all this time.

From the foregoing rather lengthy record and statement of the case, it can be seen that there was a deliberate, specific, binding contract entered into by plaintiff for the construction of this building for the price of $16,000. It does not require much effort to see the real facts in the case, and to understand exactly how the controversy arose. Dr. Brumbaugh and Mr. Post no doubt did do a good deal of talking to induce plaintiff to take this contract, but it is manifest that neither one of them ever promised to pay him for the extra cost of the change from brick to stone. All that Dr. Brumbaugh ever said to him about it, even according to plaintiff's own statement, was that he should not lose any money; but that was before the contract was made. The elementary proposition of law that all bargains, contentions, and agreements that result in a writing between the parties, merge in the writing, and that parol evidence is not accepted thereafter to vary the written instrument save under well-known rules, need not be discussed here.

Were this an action to cancel or reform the contract, or a defense against an action for a breach of it, plaintiff would be in a better position than he is. If he found, on going to Fajardo, that he had been deceived as to the quantity of material available, he could have refused to proceed with the work until a different contract had been entered into. Ricker v. Sanitary District, 89 Fed. 251. The law will not permit him to continue the work under a contract, and, by a mere unilateral claim that he should have more compensation, compel the island to pay an increased price for the work. Without positive evidence that a new contract, for a proper consideration, has been entered into

Ereño v. People of Porto Rico.

and the old one waived or modified, courts ought not lightly to force owners to pay an additional sum in order to obtain the sort of structure or work they are entitled to. Such a practice would encourage breach of contract and a breach of faith. The island received no extra work in this case. It only received what is claimed to be better and more expensive material than the contract itself called for, and the change in the material, the evidence shows, was made at the request and for the convenience of the contractor.

This plaintiff well knew that the commissioner, Dr. Brumbaugh, was the only person who could make or modify these building contracts at that time. He had erected several structures for the island. No matter how much he talked to Mr. Post, the architect, it is in evidence that when anything definite was to be done or any agreement made, Mr. Post and plaintiff always went to the commissioner, Dr. Brumbaugh, to see whether it would be agreed to. It was the duty of plaintiff to know what Post's authority was, and to know that under his contract he could not demand extra compensation save on a modification of the contract in writing, according to the extract copied supra, or on a direct promise to pay, properly acquisced in. Bowe v. United States, 42 Fed. 778. Individuals as well as courts must take notice of the extent of authority conferred by law upon a person acting in an official capacity. Whiteside v. United States, 93 U. S. 247, 23 L. ed. 882; Hawkins v. United States, 96 U. S. 689, 24 L. ed. 607. The only person who could, it seems, under the law, have entered into this alleged modification of the old contract or agreed to the alleged new one, was the commissioner, and he, as well as Mr. Post, emphatically denied it. It is regrettable if plaintiff in fact lost money on this building, but even then, there is evidence to show that it

was probably occasioned largely by his own negligence in the conduct of the work. He is an intelligent man, of wide experience as a contractor and builder. He entered into this contract knowingly. Such change as was made in it was made, as admitted, at his own request; and as all persons who could bind the government deny any promise of additional compensation, the burden of proving it being on him, we have no hesitation under the evidence in finding that he has failed in that regard. In Sharpe v. San Paulo R. Co. L. R. 8 Ch. 607, cited in note on p. 313 of Wait's Engineering and Architectural Jurisprudence, it was held that work ordered or directed by the engineer in charge must not be such work as can be included in the contract. In that case the engineer had blundered and made a change requiring a great deal more excavation at a certain point in a railroad, promising the contractor to make up for it by reducing work in another place, which he failed to do. The court held the contractor could not recover, even though the company did in some vague way ratify or did not dissent to the change. The railroad could have been built as planned and contracted for, and the court stated the law would not permit the contract to be varied in this way.

This same work of Mr. Wait cites many cases in support of the doctrine that the person in charge of the work cannot order extra work verbally when the contract itself requires the order to be in writing, and the court goes so far as to say that the contractor in such case cannot recover from the company for such extra work, either in a court of law or a court of equity. Citing Woodruff v. Rochester & P. R. Co. 108 N. Y. 39, 14 N. E. 832, and other cases. And again, in a note to § 554, he cites, in support of the same position, Bonesteel v. New York, 22 N. Y.

163; Rens v. Grand Rapids, 73 Mich. 237, 41 N. W. 263; Dillon v. Syracuse, 29 N. Y. S. R. 912, 9 N. Y. Supp. 98.

When alterations and changes are merely assented to and there is no agreement as to value and cost, the presumption is that no increased cost was contemplated. Wait, supra, § 566, and cases cited; Badders v. Davis, 88 Ala. 367, 6 So. 834; Bryant v. Stilwell, 24 Pa. 314; Jones v. Woodbury, 11 B. Mon. 167; District of Columbia v. Gallaher, 124 U. S. 505, 31 L. ed. 526, 8 Sup. Ct. Rep. 585.

The mere circumstance of the owner knowing that the extra work was doing, and not objecting to it, does not raise a contract on his part to pay plaintiff for it. Belt v. Cook, 3 Cranch, C. C. 666, Fed. Cas. No. 1,282.

Some considerable evidence was introduced with reference to the final settlement between the parties, and the acceptance by plaintiff of the $1,090.86 and giving a receipt in full. We do not think much importance can be attached to this fact, because it is well settled that the circumstances concerning the giving of a receipt in full can be shown in an action between the parties regarding the subject-matter for which it was given, and it can be shown that it was a mistake, if in fact it was. The taking of a balance and giving such a receipt is of course evidence for the jury that it was intended as accord and satisfaction. Pray v. United States, 106 U. S. 594, 27 L. ed. 265, 1 Sup. Ct. Rep. 483; Tanner v. Merrill, 108 Mich. 58, 31 L.R.A. 171, 62 Am. St. Rep. 687, 65 N. W. 664; Fire Ins. Asso. v. Wickham, 141 U. S. 564, 35 L. ed. 860, 12 Sup. Ct. Rep. 84.

For the reasons here given, the court finds the issues for the defendant, with costs, and a judgment to that effect will be entered.